**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **TAGIVAN II LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE WALT DISNEY COMPANY, DISNEY MEDIA AND ENTERTAINMENT DISTRIBUTION LLC, DISNEY DTC LLC, DISNEY STREAMING SERVICES LLC, DISNEY ENTERTAINMENT & SPORTS LLC, DISNEY PLATFORM DISTRIBUTION, INC., DISNEY ELECTRONIC CONTENT, INC., BAMTECH, LLC, HULU, LLC, AND ESPN, LLC,**<br><br>**Defendants.** | **Civil Action No.**<br><br>**JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT

Plaintiff Tagivan II LLC ("Tagivan," or "Plaintiff") files this Original Complaint against The Walt Disney Company; Disney Media and Entertainment Distribution LLC; Disney Streaming Services LLC; Disney Entertainment & Sports LLC; Disney DTC LLC; Disney Platform Distribution, Inc.; Disney Electronic Content, Inc.; BAMTech, LLC; Hulu, LLC; and ESPN, LLC (collectively, "Defendants" or "Disney"), and alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff Tagivan is the owner of U.S. Patent Nos. 8,781,001 (the "'001 Patent"), 10,334,280 (the "'280 Patent"), 11,570,469 (the "'469 Patent"), and 10,992,953 (the "'953 Patent") (collectively, the "Patents-in-Suit") related to video coding technology. Disney infringes the Patents-in-Suit through its use of video coding technology, including on its online streaming platforms. Disney uses infringing video coding technology as part of applications, hardware, products, and backend

processes (together with associated equipment, the "Accused Instrumentalities"), including for example transcoding, decoding, and/or encoding for the purpose of providing videos to users, that infringe one or more claims in Plaintiff's Patents-in-Suit.

2. Video encoding plays an important role in Disney's video streaming service business model, which is based on Disney uploading content (*e.g.*, movies, TV shows, sports programs) to Disney servers, where the video can be decoded, encoded, stored, and later streamed by Disney's nearly 200 million subscribers across its Disney+, Hulu, Hulu Live, and ESPN streaming platforms, and decoded and viewed on a wide variety of apps and platforms published by Disney. In offering these services, Disney infringes Tagivan's patents, which significantly contribute to the efficiency, reliability, and quality of Disney's streaming platforms.

3. Disney relies on Tagivan's innovations to efficiently deliver high-quality video to users throughout the United States and the world. While other companies have recognized the value of Tagivan's portfolio and taken licenses, Disney continues to use Tagivan's technology without a license, thereby obtaining an unfair competitive advantage and failing to compensate Tagivan. Tagivan brings this lawsuit to end Disney's unlicensed use of Tagivan's patented technology.

## PARTIES

4. Tagivan II LLC is a limited liability company organized under the laws of Delaware, with a principal place of business at 100 Fillmore Street, Floor 5, Denver CO 80206.

5. Defendant The Walt Disney Company is incorporated in Delaware and maintains its principal place of business at 500 South Buena Vista Street, Burbank, California, 91521. Its designated agent for service of process is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. On information and belief, The Walt Disney Company sits atop the corporate structure as the ultimate parent and, together with its subsidiaries, manages and directs the

operations of every Disney streaming entity.[1]

6. Defendant Disney Media and Entertainment Distribution LLC ("DMED") is a limited liability company organized under Delaware law, with its principal place of business located at 500 South Buena Vista Street, Burbank, California, 91521. DMED's designated agent for service of process is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. On information and belief, DMED is an indirect, wholly owned subsidiary of The Walt Disney Company whose activities include P&L management, distribution, operations, sales, advertising, data, and technology for Disney+, Hulu, Hulu Live, and the ESPN streaming services.[2]

7. Defendant Disney DTC LLC, a limited liability company formed under the laws of Delaware, has its principal place of business at 500 South Buena Vista Street, Burbank, California 91521. Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808, serves as Disney DTC LLC's designated agent for service of process.[3] On information and belief, Disney DTC LLC, an indirect, wholly owned subsidiary of The Walt Disney Company, is engaged in content planning and management, third-party media sales, affiliate marketing and related business operations, negotiation of distribution contracts, and procurement of content delivery network and

---

[1] The Walt Disney Company, 2025 Form 10-K, at 2, *available at* https://www.sec.gov/Archives/edgar/data/1744489/000174448925000155/dis-20250927.htm.

[2] The Walt Disney Company, 2023 Form 10-K, at 86; The Walt Disney Company, 2025 Form 10-K, at 7, https://s206.q4cdn.com/979796730/files/doc_financials/2025/ar/2025-Annual-Report.pdf ("ESPN offers a U.S. subscription-based DTC service with two plans: ESPN Select and ESPN Unlimited, which started in August 2025. ESPN Select, previously the ESPN+ service through August 2025, offers thousands of live sporting events, on-demand sports content and other original content."); *see also Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), D.I. 18 at 1.

[3] Public filings suggest that Disney DTC LLC may now operate under the name Disney Platform Distribution, Inc. *See, e.g.*, *In re Disney DTC, LLC*, No. 05-23-00485-CV, 2024 WL 358117 (Tex. App.—Dallas Jan. 31, 2024). Accordingly, each allegation in this Complaint directed to Disney DTC LLC is equally directed to Disney Platform Distribution, Inc.

cloud computing for Disney+, Hulu, Hulu Live, and the ESPN streaming services.[4]

8. Defendant Disney Streaming Services LLC is organized as a limited liability company under Delaware law and has its principal place of business at 500 South Buena Vista Street, Burbank, California, 91521. Its agent for service of process is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. On information and belief, Disney Streaming Services LLC, an indirect, wholly owned subsidiary of The Walt Disney Company, carries out financial and marketing functions for Disney+, Hulu, Hulu Live, and the ESPN streaming services.[5]

9. Disney Entertainment & Sports LLC[6] is a limited liability company organized under the laws of Delaware, with its principal place of business at 500 South Buena Vista Street, Burbank, California, 91521. It has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 to accept service of process on its behalf. On information and belief, Disney Entertainment & Sports LLC, an indirect, wholly owned subsidiary of The Walt Disney

[4] The "Terms of Use" page on the ESPN website links to a Disney webpage that states, "Disney DTC LLC and/or its affiliates and subsidiaries (collectively, 'Disney' 'we' or 'us') are pleased to provide to you certain websites, software, applications, content, products, and services in any media format or channel, now known or hereafter devised ('Disney Products' and 'Products'), which may be branded Disney, ABC, ESPN, Marvel, Pixar, Lucasfilm, FX, Searchlight Pictures, 20th Century Studios, National Geographic, or another brand owned or licensed by Disney." *English – Disney Terms of Use – United States*, THE WALT DISNEY COMPANY (May 24, 2024), https://disneytermsofuse.com/english/; *see also Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), D.I. 18 at 1.

[5] The Disney website identifies Disney Streaming Services, LLC as the distribution entity for both Disney+ and the ESPN streaming services. *The Walt Disney Family of Companies*, THE WALT DISNEY COMPANY, https://privacy.thewaltdisneycompany.com/en/company-overview/. *See also Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), D.I. 18 at 2.

[6] According to Delaware and California public filings, Disney Entertainment & Sports LLC previously operated as Disney Streaming Technology LLC and/or Disney Technology LLC. To ensure that the proper party receives adequate notice, every allegation in this Complaint concerning Disney Entertainment & Sports LLC applies equally to Disney Streaming Technology LLC and Disney Technology LLC, and each allegation concerning those entities applies equally to Disney Entertainment & Sports LLC.

Company, designs and maintains the websites for Disney+, Hulu, Hulu Live, and the ESPN streaming services.[7]

10. Defendant Disney Platform Distribution, Inc., a Delaware corporation, maintains its principal place of business at 500 South Buena Vista Street, Burbank, California, 91521. Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808, is its designated agent for service of process. On information and belief, Disney Platform Distribution, Inc. is an indirect, wholly owned subsidiary of The Walt Disney Company that participates in multiple aspects of Disney+, Hulu, Hulu Live, and the ESPN streaming services, including management of distribution efforts, affiliate marketing and affiliate-related business operations, contract negotiation, content delivery networks, and cloud computing services.[8]

11. Defendant Disney Electronic Content, Inc. ("Disney Electronic Content"), a Delaware corporation, has its principal place of business at 500 South Buena Vista Street, Burbank, CA 91521. Disney Electronic Content's designated agent for service of process is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. On information and belief, Disney Electronic Content is a subsidiary of The Walt Disney Company. On information and belief, Disney Electronic Content acts as a legal and digital entity behind the Disney+ streaming service and related digital applications.

12. Defendant BAMTech, LLC ("BAMTech"), a Delaware limited liability company, has its principal place of business at 50 Vandam Street, 9W, New York, NY 10013. BAMTech's designated

---

[7] *See, e.g., Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), D.I. 18 at 2.

[8] The subscriber agreement for Disney+ and the ESPN streaming services is hosted on a Disney webpage and refers to Disney Platform Distribution, Inc. as the relevant entity. *Disney+, ESPN, and Hulu Subscriber Agreement*, DISNEY+ (Feb. 5, 2026), https://www.disneyplus.com/legal/subscriber-agreement. *See also Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), D.I. 18 at 2.

agent for service of process is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. On information and belief, BAMTech, LLC is an indirect subsidiary of The Walt Disney Company, which holds an 80% ownership interest, with the remaining 20% held by Hearst Brazil, Inc., a subsidiary of The Hearst Corporation.[9] On information and belief, BAMTech develops and maintains the ESPN streaming website[10] and supplies technology used in Disney+ and Hulu.[11]

13. Defendant Hulu, LLC ("Hulu"), a limited liability company organized under Delaware law, has its principal place of business at 2500 Broadway, Santa Monica, CA 90404. Hulu's designated agent for service of process is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. On information and belief, Hulu is an indirect subsidiary of The Walt Disney Company and operates Hulu and Hulu Live.[12]

14. Defendant ESPN, LLC ("ESPN") is a limited liability company organized under the laws of Delaware, with its principal place of business at ESPN Plaza, Bristol, Connecticut 06010. ESPN has designated Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 as

---

[9] *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), D.I. 18 at 2; *see also* The Walt Disney Company, 2024 Form 10-K, at 89 (stating that The Walt Disney Company purchased MLB's 15% interest in BAMTech LLC in November 2022).

[10] BAMTech's website directs users seeking its privacy policy to a page hosted on a Disney website, available at https://web.archive.org/web/20250519003111/https://www.bamtechmedia.com/ (last accessed Oct. 5, 2026 via Internet Archive). The subscriber agreement for Disney+, ESPN, and Hulu is hosted on a Disney webpage and refers to BAMTech, LLC as the relevant entity. *Disney+, ESPN, and Hulu Subscriber Agreement*, DISNEY+ (Feb. 5, 2026), https://www.disneyplus.com/legal/subscriber-agreement.

[11] Alex Weprin, *Disney Pays $900M for MLB's Remaining Stake in Streaming Company BAMTech*, HOLLYWOOD REPORTER (Nov. 29, 2022), https://www.hollywoodreporter.com/business/digital/disney-pays-900m-for-bamtech-1235271788/.

[12] The Walt Disney Company, 2024 Form 10-K, at 88-89 (stating that The Walt Disney Company owns 67% of Hulu and purchased NBC Universal's 33% interest in Hulu in November 2023); *see also* The Walt Disney Company, 2025 Form 10-K, at 96 (reporting that Disney paid an incremental amount in fiscal 2025 to acquire 100% ownership of Hulu). Hulu's website directs users seeking its privacy policy to a page hosted on a Disney website.

its agent for service of process. On information and belief, ESPN is an indirect subsidiary of The Walt Disney Company, which owns 80% of ESPN; the other 20% is owned by Hearst Brazil, Inc., a subsidiary of The Hearst Corporation.[13] On information and belief, ESPN is responsible for managing and operating the ESPN streaming services.[14]

## ACCUSED INSTRUMENTALITIES

15. Defendants offer the Disney+, Hulu, Hulu Live, and the ESPN streaming services ("Disney platforms"). For example, Defendants offer, distribute, and encourage users to download and use the Disney+, Hulu, and the ESPN streaming services applications ("Disney applications") through which subscribers can access Disney platforms.

16. Disney uploads video content to Disney's servers. Disney's transcoders are used, for example, in decoding uploaded video and re-encoding or encoding video for distribution and consumption by Disney subscribers.

17. Disney's video coding services, activities, and/or related equipment, including related to encoders (including, for example, those in the Disney applications and those on Disney servers) that encode video into H.265-compliant formats, infringe the Patents-in-Suit and are included within the Accused Instrumentalities.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over the patent infringement claims in this case under 28 U.S.C. §§ 1331 and 1338.

19. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Count V

---

[13] *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231 (D. Del. 2024), D.I. 18 at 2.

[14] The Walt Disney Company, 2024 Form 10-K, at 7 (stating that The Walt Disney Company holds an 80% ownership interest in ESPN). The "Terms of Use" tab on the ESPN website links to a page hosted on a Disney website.

(declaratory judgment that Tagivan has complied with any RAND commitments). An actual controversy over all counts exists between the parties to this case.

20. This Court has general personal jurisdiction over each Disney entity by virtue of their incorporation/organization in Delaware. Disney has appointed Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808 as its agent for service of process. This Court has specific personal jurisdiction over Disney because Disney has, directly and/or through agents and/or intermediaries, committed acts and continues to commit acts of patent infringement, including within Delaware, giving rise to this action and has established minimum contacts with Delaware such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

21. Disney, among other things, uses the infringing Accused Instrumentalities to encode videos in suitable formats for distribution; and to place one or more encoded video bitstreams into the stream of commerce over the internet with the knowledge and/or understanding that such Accused Instrumentalities were being utilized for the purpose of offering services and videos in Delaware.

22. On information and belief, Disney regularly conducts and has conducted business in Delaware and purposefully avails itself of the privileges of conducting business in Delaware. On information and belief, Disney, and/or its agents and/or intermediaries, makes, uses, imports, offers for sale, sells, and/or advertises its products and affiliated services in Delaware, sufficient to give rise to jurisdiction.

23. Disney also files its own actions related to RAND commitments in the H.265 video coding space in this District. *See, e.g., Disney Enterprises, Inc. v. InterDigital, Inc. et al.*, No. 25-cv-996-MN (D. Del. filed August 8, 2025). In addition, on information and belief, Disney derives and has derived substantial revenue from the Accused Instrumentalities within Delaware, and/or expect or should reasonably expect its actions to have consequences in Delaware.

24. Defendants' infringing activity has led to foreseeable harm and injury to Tagivan.

25. Venue is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b). As set forth above, Disney has committed acts of infringement in this District and has a regular and established place of business in this District, and each Disney entity is incorporated in this District.

## FACTUAL BACKGROUND

26. Tagivan holds a large portfolio of patents that improve the speed, efficiency, and quality of video coding. Disney operates several streaming platforms—including Disney+, Hulu, Hulu Live, and the ESPN streaming services—that rely on video coding technology covered by Tagivan's patents to prepare, distribute, and deliver video content to subscribers. The platforms and the entities that operate and support them are described as follows:

27. Disney+ is an on-demand streaming service that offers media content from Disney, Pixar, Marvel, Star Wars, and National Geographic. Disney+ also provides access to certain on-demand media content from Hulu for certain subscribers via bundled plans. Disney+ offers "hundreds of films, thousands of episodes and many Disney+ Originals."[15] The subscription allows users to stream across multiple supported devices at once.[16] Disney+ supports streaming on web browsers, mobile devices, tablets, streaming sticks, gaming consoles, smart TVs, vehicle infotainment systems, and set-top boxes. Super Bowl LXI will be streamed on Disney+, joining the platform's extensive library of movies and television shows.[17]

28. Disney+ uses HEVC-compliant formats to stream video[18] and to deliver 3D movies, for

---

[15] *See Getting started with Disney+*, DISNEY+ HELP CENTER, https://help.disneyplus.com/article/disneyplus-introduction (last accessed March 2026).

[16] *See id.*

[17] ESPN, ESPN's Super Bowl LXI broadcast will also stream on Disney+, https://www.espn.com/nfl/story/_/id/50125971/espn-super-bowl-61-broadcast-stream-disney+.

[18] Disney has admitted that Disney+ uses the HEVC/H.265 codec. *See Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231-MN (D. Del. Oct. 31, 2025), D.I. 66 ¶ 526 ("Disney further admits Disney+ uses the HEVC/H.265 codec."); *see also Google, Netflix &*

example via Apple Vision Pro.[19]

29. Hulu is a streaming service and offers both live and on-demand content. Hulu provides access to television shows from major U.S. broadcast networks, as well as libraries of television series and films—including Hulu Originals and other content available exclusively on Hulu.[20] Hulu also offers a Live TV component to its subscriptions that includes access to 95+ live television channels.[21] Hulu Live subscribers can watch live sports, breaking news, awards shows, primetime dramas, daytime soaps, local teams and weather forecasts, as well as other on-demand content in the Hulu streaming library.[22] In October 2025, Disney combined certain Hulu Live TV assets with FuboTV Inc. ("Fubo"), a publicly traded virtual multichannel video programming distributor, to form a combined entity in which Disney holds a 70 percent interest. Disney remains the exclusive distributor of the Hulu Live TV service under the combined arrangement, and Hulu Live TV continues to be available to consumers as a separate offering.[23] Hulu Live TV is also being integrated with Disney+.[24]

30. Hulu uses HEVC-compliant formats for at least some of its streaming and employs multiple

---

*YouTube to require AV1 video decoding support*, FLATPANELSHD.COM, https://www.flatpanelshd.com/news.php?subaction=showfull&id=1613043929#:~:text=AV1%20is%20gaining%20momentum,under%20'OS%20&%20features').

[19] *Disney+ on Apple Vision Pro Ushers in a New Era of Storytelling Innovation and Immersive Entertainment*, DISNEY+, https://press.disneyplus.com/news/disney-plus-on-apple-vision-pro-ushers-in-a-new-era-of-storytelling-innovation-and-immersive-entertainment; *New report Highlights Impact of HEVC Codec on Streaming Industry*, INTERDIGITAL, INC., https://ir.interdigital.com/news-events/press-releases/news-details/2023/New-Report-Highlights-Impact-of-HEVC-Codec-on-Streaming-Industry/default.aspx.

[20] *See About Hulu*, HULU PRESS, https://press.hulu.com/corporate/.

[21] *Id.*

[22] *See Hulu + Live TV Plans*, HULU HELP CENTER, https://help.hulu.com/article/hulu-what-is-hulu-live-tv.

[23] The Walt Disney Company, 2025 Form 10-K, at 5, 91-92.

[24] Hulu on Disney+ Just Got Better: What You Need to Know About Linking Your Profiles, THE WALT DISNEY COMPANY, https://thewaltdisneycompany.com/news/hulu-disney-plus-profile-linking/.

content delivery networks.[25]

31. ESPN offers two subscription-based DTC streaming plans: ESPN Select and ESPN Unlimited (collectively, the "ESPN streaming services"), which launched in August 2025. ESPN Select, formerly known as ESPN+[26], offers thousands of live sporting events, on-demand sports content, and other original programming.[27] ESPN Unlimited includes access to all of ESPN's branded television channels along with ESPN Select content. The ESPN streaming services support streaming on web browsers, mobile devices, tablets, streaming sticks, gaming consoles, smart TVs, vehicle infotainment systems, and set-top boxes.[28]

32. Upon information and belief, at least a portion of the ESPN streaming services use HEVC-compliant formats and multiple content delivery networks.

33. The Disney+, Hulu, Hulu Live, and the ESPN streaming services are not operated by a single entity. Rather, multiple Disney subsidiaries and affiliates each perform distinct functions in creating, managing, and delivering the accused streaming services. The following sections describe the specific roles those entities play and the relationships among them.

### A. DEFENDANTS' ROLES IN OPERATING THE STREAMING SERVICES

34. At the top of the Disney enterprise responsible for the accused streaming services is The Walt Disney Company. The parent sets corporate priorities, assigns resources, defines commercial goals,

---

[25] *What Are HEVC and AVC? H.265 and H.264 Video Codecs Explained*, TOM'S HARDWARE, https://www.tomshardware.com/reference/h264-h265-hevc-codec-definition; *New report Highlights Impact of HEVC Codec on Streaming Industry*, INTERDIGITAL, INC., https://ir.interdigital.com/news-events/press-releases/news-details/2023/New-Report-Highlights-Impact-of-HEVC-Codec-on-Streaming-Industry/default.aspx. In addition, Disney admitted that "Hulu uses the HEVC/H.265 codec." *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231-MN (D. Del. Oct. 31, 2025), D.I. 66 ¶ 531.

[26] For clarity, activities under the formerly known ESPN+ brand are accused beginning six years prior to the filing of this complaint.

[27] THE WALT DISNEY COMPANY, 2025 Form 10-K, at 7.

[28] *See id.*

and supervises the businesses that deliver Disney+ and Hulu entertainment and the ESPN streaming services' sports content to subscribers.[29] On information and belief, it directs and supervises the subsidiaries and affiliates beneath it, each of which handles a distinct part of the streaming business, such as content, distribution, technology, marketing, and platform operations. The paragraphs that follow set out each Defendant's particular role within that enterprise.

35. On information and belief, The Walt Disney Company manages the Disney Entertainment and ESPN segments, including the teams and executives responsible for Disney+, Hulu, Hulu Live, and the ESPN streaming services. Through these segments, the parent decides how content, technology, distribution, advertising, and subscriber services are structured.

36. The Disney+ and Hulu businesses sit within the Disney Entertainment segment,[30] and the ESPN streaming services sit within the ESPN segment. On information and belief, shared Disney organizations, such as Product & Technology, Advertising Sales, and Platform Distribution, support both segments and supply common capabilities used across the accused platforms.

37. On information and belief, executives who are employed or controlled by The Walt Disney Company decide matters relating to the design, launch, pricing, distribution, promotion, and ongoing operation of each accused platform. The Walt Disney Company captures the economic benefits of those activities through the enterprise's subscription, advertising, licensing, and content businesses.

---

[29] *See, e.g.*, *Justin Connolly*, THE ORG, https://web.archive.org/web/2024/https://theorg.com/org/disney/org-chart/justin-connolly (last accessed Sept. 17, 2026 via Internet Archive); *see also The Walt Disney Company Announces Strategic Restructuring, Restoring Accountability To Creative Businesses*, THE WALT DISNEY COMPANY (Feb. 9, 2023), https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-restructuring-restoring-accountability-to-creative-businesses/.

[30] Disney has admitted that "The Walt Disney Company's Disney Entertainment segment includes Disney+ and Hulu, and that the ESPN business segment includes ESPN+." *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231-MN (D. Del. Oct. 31, 2025), D.I. 66 ¶ 158.

38. On information and belief, The Walt Disney Company thus takes part in the accused technology chain even where a subsidiary or shared-service group performs a given task. Its management of the enterprise extends to oversight of the encoding, transcoding, storage, delivery, decoding, and playback functions used to deliver video to subscribers.

39. DMED is a subsidiary of The Walt Disney Company and continues to exist as a separate legal entity within Disney's corporate structure.[31] In February 2023, The Walt Disney Company restructured its media and entertainment operations, which it had previously reported as one segment, into the Entertainment and Sports segments.[32] On information and belief, DMED still performs or supports operational, distribution, and commercial functions for the direct-to-consumer businesses, including functions relating to Disney+, Hulu, and the ESPN streaming services.[33]

40. On information and belief, DMED carries out or supports distribution, operations, sales, advertising, data, and technology functions for one or more Disney streaming platforms. Those responsibilities concern the commercial and operational sides of the direct-to-consumer businesses.

41. On information and belief, DMED coordinates or supports commercial, distribution, advertising, and operational work for one or more of the accused streaming services, including work relating to the delivery of video to subscribers.

42. On information and belief, DMED takes part in the business processes through which video

---

[31] The Walt Disney Company, 2025 Form 10-K, Exhibit 21 (listing Disney Media & Entertainment Distribution LLC as a subsidiary).

[32] *The Walt Disney Company Announces Strategic Restructuring, Restoring Accountability To Creative Businesses*, THE WALT DISNEY COMPANY (Feb. 9, 2023), https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-restructuring-restoring-accountability-to-creative-businesses/.

[33] *See, e.g.,* The Walt Disney Company, 2023 Form 10-K, at 86; *The Walt Disney Company Announces Strategic Restructuring, Restoring Accountability To Creative Businesses*, THE WALT DISNEY COMPANY (Feb. 9, 2023), https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-restructuring-restoring-accountability-to-creative-businesses/.

is readied for distribution, introduced into the streaming supply chain, and made available via applications and connected devices.

43. On information and belief, DMED coordinates or supports the monetization of one or more platforms through subscription sales, advertising, distribution arrangements, and other commercial channels. Because it participates in these revenue-generating activities, DMED has a financial stake in the continued operation of the Accused Instrumentalities.

44. Disney DTC LLC (also known as Disney Platform Distribution, Inc.) is an indirect, wholly owned subsidiary of The Walt Disney Company. On information and belief, Disney DTC LLC serves as the distribution-facing entity for Disney's direct-to-consumer services, is named as a party to the Disney+, ESPN, and Hulu subscriber agreement, and carries out content, distribution, marketing, and procurement functions for the streaming businesses.[34]

45. Disney DTC LLC is responsible for content planning and administration for Disney+ and Hulu. That work includes determining how programming is organized, scheduled, packaged, and offered through the on-demand services, and, through shared Disney operations, it supports related planning for Hulu Live and the ESPN streaming services.[35]

46. On information and belief, Disney DTC LLC oversees third-party distribution, including third-party media sales, affiliate marketing, and affiliate-related business activities connected to Disney+ and Hulu. These activities help position the services with distributors and other commercial

---

[34] *See Subscriber Agreement*, DISNEY+ (Feb. 5, 2026), https://www.disneyplus.com/legal/subscriber-agreement.

[35] *See The Walt Disney Company Announces Strategic Restructuring, Restoring Accountability To Creative Businesses*, THE WALT DISNEY COMPANY (Feb. 9, 2023), https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-restructuring-restoring-accountability-to-creative-businesses/. Disney has also admitted that DTC "is responsible for certain aspects of content management and planning for Disney+" and for Hulu. *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231-MN (D. Del. Oct. 31, 2025), D.I. 66 ¶¶ 88-89.

partners, and they also support sales of Hulu Live and the ESPN streaming services through the broader Disney portfolio.

47. On information and belief, Disney DTC LLC negotiates, or takes part in negotiating, the agreements that govern content distribution for Disney+ and Hulu, and it obtains the content delivery network capacity and cloud-computing resources used to store, process, and deliver video for the Disney services.

48. By performing these functions, Disney DTC LLC influences which video assets enter the streaming pipeline, the commercial terms on which they are distributed, and the infrastructure that transmits encoded video. On information and belief, it carries out or directs these activities in coordination with DMED and the other Defendants across all Disney platforms.

49. Disney Streaming Services LLC is an indirect, wholly owned subsidiary of The Walt Disney Company. On information and belief, it furnishes finance and marketing services for Disney+, Hulu, Hulu Live, and the ESPN streaming services and assists with the commercial administration of those offerings.[36]

50. On information and belief, Disney Streaming Services LLC assists in planning budgets, marketing campaigns, subscriber acquisition, and promotions for Disney+ and Hulu. It performs comparable finance and marketing functions for Hulu Live and the ESPN streaming services, including campaigns that promote those services both on their own and as part of bundles.

51. On information and belief, the finance personnel of Disney Streaming Services LLC monitor the costs of operating the platforms, including technology, cloud, delivery, and content-related expenses, while its marketing personnel promote services whose delivery relies on the accused

[36] The Disney website identifies Disney Streaming Services, LLC as the distribution entity for both Disney+ and ESPN+. *The Walt Disney Family of Companies*, THE WALT DISNEY COMPANY, https://privacy.thewaltdisneycompany.com/en/company-overview/.

coding and distribution processes.

52. On information and belief, Disney Streaming Services LLC takes part in decisions concerning the scale and timing of platform launches, product changes, promotional offers, and subscriber campaigns. Those decisions drive greater platform use and a larger volume of video processed through their systems.

53. Disney Entertainment & Sports LLC is an indirect, wholly owned subsidiary of The Walt Disney Company. On information and belief, it was previously known as Disney Streaming Technology LLC and/or Disney Technology LLC and operates through a technology organization sometimes referred to as DE&E Technology.

54. Disney Entertainment & Sports LLC designs, builds, and maintains the front-end and back-end infrastructure for Disney+, Hulu, Hulu Live, and the ESPN streaming services. Its product and engineering teams develop the services that users rely on to select, request, receive, decode, and watch streaming video.[37]

55. On information and belief, DE&E Technology handles end-to-end development of the streaming products. Its engineers build and maintain subscription services, account functions, application interfaces, content-management systems, advertising services, distribution tools, and other back-end systems supporting Disney's media businesses.

---

[37] *Sr Software Engineer*, DISNEY CAREERS (Jul. 24, 2026), https://www.disneycareers.com/en/job/santa-monica/sr-software-engineer/391/97917839392 ("Disney Entertainment and ESPN Product & Technology is a global organization of engineers, product developers, designers, technologists, data scientists, and more – all working to build and advance the technological backbone for Disney's media business globally"); *Lead Product Software Engineer (Kotlin)*, DISNEY CAREERS (Sep. 9, 2026), https://www.disneycareers.com/en/job/seattle/lead-product-software-engineer-kotlin/391/98050531456 ("The Product & Data Engineering team is responsible for end to end development for Disney's . . . consumer-facing products, including streaming platforms Disney+, Hulu, and ESPN+").

56. On information and belief, the technology that Disney Entertainment & Sports LLC maintains includes back-end services that ingest media, generate or manage encoded representations, route content to delivery networks, and support playback on subscriber devices. These services form part of the infrastructure through which the accused instrumentalities are used.

57. On information and belief, engineers at Disney Entertainment & Sports LLC also build infrastructure for Disney's advertising and distribution businesses. Because the same services underpin subscription management, ad insertion, content delivery, and platform operation, the entity's technology work benefits Disney+, Hulu, Hulu Live, and the ESPN streaming services alike.

58. Disney Electronic Content is a subsidiary of The Walt Disney Company. On information and belief, Disney Electronic Content is a software and digital media publisher responsible for releasing and managing the Disney+ app across various platforms (such as Roku, iOS, Android, and smart TVs). On information and belief, the technology that Disney Electronic Content maintains includes back-end services that ingest media, generate or manage encoded representations of media, route content to delivery networks, and support playback on subscriber devices. These services form part of the infrastructure through which the accused instrumentalities are used.

59. BAMTech is an indirect subsidiary approximately 80 percent owned by The Walt Disney Company, with Hearst holding the remaining interest. BAMTech develops and maintains technology for streaming products and functions as a technology provider within Disney's wider direct-to-consumer ecosystem.[38]

60. On information and belief, BAMTech develops and maintains the ESPN streaming website

---

[38] Alex Weprin, *Disney Pays $900M for MLB's Remaining Stake in Streaming Company BAMTech*, HOLLYWOOD REPORTER (Nov. 29, 2022), https://www.hollywoodreporter.com/business/digital/disney-pays-900m-for-bamtech-1235271788/.

and related services. It provides technology used to run Disney+, Hulu, and other Disney streaming offerings, including services supporting Hulu Live and the delivery of sports programming through the ESPN streaming services.

61. On information and belief, BAMTech's technology encompasses software and systems that handle subscriber requests, organize media catalogs, interface with delivery infrastructure, and support video playback. These systems take part in processing video representations that use the coding technology at issue.

62. The ESPN subscriber agreement names BAMTech, which performs services for the ESPN streaming services. BAMTech's work also ties into Disney+ and Hulu, because Disney relies on common technology components and operating practices across those services.[39]

63. Hulu is a wholly owned subsidiary of The Walt Disney Company. Disney acquired NBCUniversal's remaining stake in Hulu in November 2023, and in fiscal 2025, after an appraisal process concluded, Disney paid an additional amount to obtain full ownership.[40] Hulu remains the entity that operates the Hulu service and Hulu Live.[41] As a result of an October 2025 transaction, certain Hulu Live TV assets were combined with FuboTV Inc. into a combined entity in which Disney holds a 70 percent interest, and Disney continues as the exclusive distributor of the Hulu Live TV service.[42]

64. On information and belief, Hulu provides the end-to-end business and product functions for Hulu, including its on-demand library, and for Hulu Live, including live channels and related

---

[39] *See Subscriber Agreement*, DISNEY+ (Feb. 5, 2026), https://www.disneyplus.com/legal/subscriber-agreement.

[40] The Walt Disney Company, 2025 Form 10-K, at 96.

[41] Disney has admitted that "Hulu, LLC operates the Hulu and Hulu Live video streaming services." *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231-MN (D. Del. Oct. 31, 2025), D.I. 66 ¶¶ 570, 640, 920.

[42] The Walt Disney Company, 2025 Form 10-K, at 5, 19-20.

interactive features. It decides how those services are presented, maintained, and offered to subscribers.

65. On information and belief, Hulu takes part in financing, marketing, content planning, product development, and distribution decisions for Hulu and Hulu Live, and it coordinates with other Disney entities when Hulu content or subscriptions are offered through Disney+ or alongside the ESPN streaming services.

66. On information and belief, Hulu relies on technology, delivery networks, cloud services, and coding workflows that other Defendants supply or manage. Hulu and Hulu Live streams are thus generated through a coordinated chain that includes the Accused Instrumentalities.

67. ESPN is an indirect subsidiary approximately 80 percent owned by The Walt Disney Company, with Hearst owning the rest. On information and belief, ESPN manages and operates the ESPN streaming services, a set of sports-focused streaming offerings sold under the ESPN brand.[43] If a pending transaction closes, NFL Enterprises LLC would obtain a 10 percent noncontrolling interest in ESPN, lowering The Walt Disney Company's effective interest to about 72 percent and Hearst's to about 18 percent.[44]

68. On information and belief, ESPN oversees the content slate and planning for the ESPN streaming services, including live sports, recorded and original programming, and related sports-media offerings, and it decides how that programming is packaged, scheduled, promoted, and made available to subscribers.

---

[43] The Walt Disney Company, 2024 Form 10-K, at 7 (stating that The Walt Disney Company holds an 80% ownership interest in ESPN). ESPN's website directs users seeking its terms of use to a page hosted on a Disney website. Disney has also admitted that "ESPN manages and operates ESPN+ video streaming service," *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231-MN (D. Del. Oct. 31, 2025), D.I. 66 ¶ 862, and that ESPN manages and operates "certain aspects of ESPN+," *id.* ¶ 120.

[44] The Walt Disney Company, 2025 Form 10-K, at 8, 91-92.

69. On information and belief, ESPN also provides financing and marketing direction for the ESPN streaming services, working with Disney's distribution, technology, and platform teams to grow subscriptions and to position the ESPN streaming services within Disney's broader bundling and cross-promotion strategy.

70. On information and belief, the ESPN streaming services rely on shared account, application, delivery, and video-processing capabilities provided by Disney and its affiliates. ESPN therefore benefits from and participates in the technical systems through which video is encoded, delivered, decoded, and viewed.

71. Significant portions of the technology used to run the Accused Instrumentalities are shared among the Defendants. Disney Entertainment & ESPN Technology ("DE&E Technology") designs and builds infrastructure supporting media ingestion, content management, subscriber access, advertising, distribution, and playback across Disney+, Hulu, Hulu Live, and the ESPN streaming services.[45]

72. BAMTech technology is likewise a common element of Disney's streaming environment. On information and belief, the same or related services developed by BAMTech support Disney+, Hulu, and other Disney offerings, as well as the ESPN streaming website and its associated

[45] *See, e.g.*, *The Walt Disney Company Announces Strategic Restructuring, Restoring Accountability To Creative Businesses*, THE WALT DISNEY COMPANY (Feb. 9, 2023), https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic restructuring-restoring-accountability-to-creative-businesses/ ("several shared-service organizations across the company support both Disney Entertainment and ESPN, facilitating company-wide efficiencies and creating a more cost-effective, coordinated, and streamlined approach to operations. These include Product and Technology …."); *Sr Product Software Engineer*, DISNEY CAREERS (Sep. 17, 2026), https://www.disneycareers.com/en/job/santa-monica/sr-product-software-engineer/391/100720373248 (DE&E Technology "design[s] and build[s] the infrastructure that [powers] Disney's media, advertising, and distribution businesses").

subscriber functions.[46]

73. On information and belief, this common infrastructure lets the Defendants reuse systems for ingesting source video, generating alternate representations, storing media, routing streams, and serving content to devices. On information and belief, these shared systems include components that carry out or facilitate the accused video coding operations.

74. Personnel and managerial authority are also shared among the Defendants. Aaron LaBerge, for instance, previously served as President and Chief Technology Officer for Disney Entertainment and ESPN, which placed technology leadership for Disney+, Hulu, Hulu Live, and the ESPN streaming services under one executive structure.[47]

75. Justin Connolly has served as President of Disney DTC LLC, with oversight of distribution for the direct-to-consumer services, a role that extends to the commercial channels through which Disney+, Hulu, Hulu Live, and ESPN+ are offered to subscribers and partners.[48] Joe Earley, for his part, has served as President of Direct-to-Consumer and has led the Disney+ and Hulu businesses; he and Adam Smith now serve as co-presidents of Direct to Consumer, managing financial

[46] Alex Weprin, *Disney Pays $900M for MLB's Remaining Stake in Streaming Company BAMTech*, HOLLYWOOD REPORTER (Nov. 29, 2022), https://www.hollywoodreporter.com/business/digital/disney-pays-900m-for-bamtech-1235271788/ ("BAMTech technology powers Disney+, Hulu and Disney's other offerings").

[47] Harry McCracken, *Why Disney Plus's new Hulu integration was such a huge, high-stakes challenge*, FAST COMPANY (Dec. 7, 2023), https://www.fastcompany.com/90993539/disney-plushulu-integration-beta.

[48] *Justin Connolly*, THE ORG, https://web.archive.org/web/2024/https://theorg.com/org/disney/org-chart/justin-connolly (last accessed Sept. 17, 2026 via Internet Archive); *see also The Walt Disney Company Announces Strategic Restructuring, Restoring Accountability To Creative Businesses*, THE WALT DISNEY COMPANY (Feb. 9, 2023), https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-restructuringrestoring-accountability-to-creative-businesses/ ("Effective immediately, several shared-service organizations across the company will support both Disney Entertainment and ESPN, facilitating company-wide efficiencies and creating a more cost-effective, coordinated, and streamlined approach to operations. These include . . . Platform Distribution led by Justin Connolly.").

performance across Disney+ and Hulu.[49] Earley's roles show that strategic decisions for these services are made within a single Disney organization rather than by fully independent businesses.[50]

76. On information and belief, employees in product management, engineering, advertising, data, legal, finance, distribution, and subscriber support work for, or take direction from, more than one Defendant, and these shared personnel coordinate platform features and the handling of encoded video across the Disney services.[51]

77. Multiple Defendants list 500 South Buena Vista Street, Burbank, California, as a principal place of business. That shared location reflects the operational integration among the parent, DMED, Disney DTC LLC, Disney Platform Distribution, Disney Streaming Services LLC, Disney Electronic Content, Inc., and Disney Entertainment & Sports LLC.

78. On information and belief, even where a Defendant lists a different address, its platform work is carried out through facilities, personnel, systems, and management coordinated with the Burbank operations. On information and belief, the Defendants rely on those shared facilities to plan and

---

[49] *The Walt Disney Company Sets Leadership Team for Expanded Disney Entertainment Segment*, THE WALT DISNEY COMPANY (Mar. 16, 2026), https://thewaltdisneycompany.com/news/entertainment-leadership-team/.

[50] *Our Executive Team*, HULU PRESS, https://web.archive.org/web/2024/https://press.hulu.com/bios/joe-earley/ (last accessed Sept. 17, 2026 via Internet Archive); *The Walt Disney Company Sets Leadership Team for Expanded Disney Entertainment Segment*, THE WALT DISNEY COMPANY (Mar. 16, 2026), https://thewaltdisneycompany.com/news/entertainment-leadership-team/; *see also Alisa Bowen Named President Of Disney+*, DISNEY+ (Sept. 29, 2022), https://press.disneyplus.com/news/alisa-bowen-named-president-of-disney-plus. Disney has further admitted that "certain employees are shared among certain of Defendants." *Adeia Techs. Inc. et al. v. The Walt Disney Company et al.*, No. 1:24-cv-01231-MN (D. Del. Oct. 31, 2025), D.I. 66 ¶ 140.

[51] *Launch Readiness Program Manager*, DISNEY CAREERS (Sep. 16, 2026), https://www.disneycareers.com/en/job/santa-monica/launch-readiness-program-manager/391/100736260400 ("This position is with Hulu, LLC …."); *Sr Product Software Engineer*, DISNEY CAREERS (Sep. 17, 2026), https://www.disneycareers.com/en/job/santa-monica/sr-product-software-engineer/391/100720373248 ("This position is with Disney Entertainment & Sports LLC ….").

administer the accused streaming activities.

79. Subscribers typically access more than one accused platform using MyDisney accounts or related Disney account credentials. This account architecture enables the Defendants to identify subscribers across services and to manage bundled or cross-platform access.

80. The services' subscriber agreements, terms of use, and privacy policies direct subscribers to Disney-controlled webpages and describe how the Disney entities relate to one another. On information and belief, these documents allow the Defendants to share responsibility for the services, subscriber data, platform technology, and content delivery.[52]

81. Disney+, Hulu, and the ESPN streaming services are marketed and sold jointly through bundle offerings. The bundle pages and checkout process portray the services as complementary components of one Disney subscription strategy and urge subscribers to buy access to multiple platforms.[53]

82. On information and belief, because of the bundle arrangements, a subscriber's use of one platform enhances the commercial value of the others, and the Defendants must coordinate account access, billing, advertising, content presentation, and technical support across the services.[54]

83. On information and belief, the Defendants jointly plan and fund the cross-promotion, which

---

[52] *Subscriber Agreement*, DISNEY+ (Feb. 5, 2026), https://www.disneyplus.com/legal/subscriber-agreement; *Hulu Subscriber Agreement*, HULU (Feb. 5, 2026), https://www.hulu.com/subscriber_agreement; *See generally* ESPN, https://plus.espn.com/; DISNEY+, https://www.disneyplus.com/; HULU, https://www.hulu.com/welcome.

[53] *See Disney Bundle*, DISNEY+, https://www.disneyplus.com/welcome/disney-hulu-espn-bundle ("The Hulu + Live TV plans include 95+ live TV channels and additional on-demand content from your favorite sports, entertainment, and news channels you can watch at home or on-the-go. You will also get access to the content from Disney+, Hulu and ESPN+ streaming libraries. Access content from each service separately. Learn more and sign up here.") (linking to https://www.hulu.com/live-tv).

[54] *Id.*; ESPN, https://plus.espn.com/ ("Hulu + Live TV, DIRECTV, Fubo TV, Spectrum TV, Verizon FiOS, U-verse, and Cox customers may already get ESPN Unlimited as part of their pay-TV package. You will need to activate your ESPN plan and connect your MyDisney login.").

moves users between services, raises the number of streams handled by the shared infrastructure, and promotes continued use of the coding and delivery systems at issue.

### B. AGENCY RELATIONSHIPS AMONG DEFENDANTS

84. On information and belief, the Defendants rely on agency relationships to perform streaming, distribution, technology, marketing, and subscriber-service functions for one another. Every agency relationship alleged below relates to the accused platforms and to the activities through which video is prepared, coded, delivered, decoded, or monetized.

85. On information and belief, DMED serves as an agent of The Walt Disney Company with respect to the parent's streaming platform activities, and it serves as an agent of Disney DTC LLC, Disney Streaming Services LLC, and Disney Entertainment & Sports LLC when it coordinates their platform functions.

86. On information and belief, DMED serves as an agent of Disney Electronic Content, BAMTech, Hulu, and ESPN with respect to the business, technology, distribution, and marketing activities of their platforms. DMED performs its enterprise coordination for those entities' benefit and under authority conferred by the Disney organization.

87. On information and belief, DMED's authority extends to setting priorities, assigning tasks, evaluating performance, and aligning the commercial and technical work of the other Defendants. When DMED performs these tasks for another Defendant, it acts subject to that Defendant's interest in operating and profiting from its streaming platform.

88. On information and belief, Disney DTC LLC serves as an agent of The Walt Disney Company and DMED with respect to their streaming platform activities, and as an agent of Disney Streaming Services LLC and Disney Entertainment & Sports LLC when it procures infrastructure, plans content, coordinates the direct-to-consumer services, or carries out distribution and marketing plans.

89. On information and belief, Disney DTC LLC serves as an agent of Disney Electronic Content, BAMTech, Hulu, and ESPN with respect to the content, affiliate, cloud, CDN, subscriber-contracting, and distribution activities that support their platforms. Its contracting and procurement work, such as negotiating content-distribution agreements and securing platform access, is carried out for the benefit of the services those entities operate.

90. On information and belief, Disney DTC LLC is authorized to bind or commit the relevant Disney businesses and to negotiate with third parties for them in arrangements concerning media distribution, subscriber agreements, cloud capacity, delivery networks, affiliate programs, and marketing. In performing those assignments, it acts within the scope of the agency conferred by the entities whose services rely on those arrangements.

91. On information and belief, Disney Streaming Services LLC serves as an agent of The Walt Disney Company and DMED with respect to the finance and marketing of Disney+, Hulu, Hulu Live, and the ESPN streaming services, and as an agent of Disney DTC LLC and Disney Entertainment & Sports LLC when those activities are combined with content and technology work.

92. On information and belief, Disney Streaming Services LLC serves as an agent of Disney Electronic Content, BAMTech, Hulu, and ESPN with respect to platform promotion, budgeting, subscriber acquisition, and service launches, and its work is intended to further those entities' platform interests.

93. On information and belief, personnel of Disney Streaming Services LLC exercise delegated authority when they establish budgets, choose promotional channels, evaluate subscriber growth, and coordinate marketing across the services. They perform those acts on behalf of the other Defendants that own, operate, or distribute the promoted platforms.

94. On information and belief, Disney Entertainment & Sports LLC serves as an agent of The

Walt Disney Company and DMED with respect to designing and maintaining their streaming technology, and as an agent of Disney DTC LLC and Disney Streaming Services LLC when it develops systems used in their content and subscriber programs.

95. On information and belief, Disney Entertainment & Sports LLC serves as an agent of Disney Electronic Content, BAMTech, Hulu, and ESPN with respect to the software, infrastructure, account, delivery, and playback services their platforms use. Its engineers perform work for those entities even where the technology is deployed through a shared Disney system.

96. On information and belief, Disney Entertainment & Sports LLC takes requirements from the service businesses, turns them into products and services, and maintains the resulting systems. This is agency conduct because the technology is built and run to achieve the other Defendants' streaming objectives.

97. On information and belief, BAMTech serves as an agent of The Walt Disney Company and DMED with respect to the technology used to run their streaming products, and as an agent of Disney DTC LLC and Disney Streaming Services LLC when it furnishes software, subscriber, and platform services for their direct-to-consumer offerings.

98. On information and belief, BAMTech serves as an agent of Disney Entertainment & Sports LLC with respect to the websites, applications, delivery services, and account systems used by the streaming platforms, and as an agent of Hulu and ESPN with respect to the technology supporting Hulu, Hulu Live, and the ESPN streaming services.

99. On information and belief, BAMTech takes product requirements and operating direction from the Disney businesses whose services rely on its technology. Its development, maintenance, and support work is thus done on behalf of the other Defendants and within the scope of the assignments they give it.

100. On information and belief, Hulu serves as an agent of The Walt Disney Company and DMED with respect to operating, marketing, and monetizing Hulu and Hulu Live, and as an agent of Disney DTC LLC and Disney Streaming Services LLC when it performs content, finance, and promotional activities for those services.

101. On information and belief, Hulu serves as an agent of Disney Entertainment & Sports LLC with respect to the technology, CDN, cloud, affiliate, and distribution functions used for Hulu and Hulu Live, and as an agent of BAMTech and ESPN when it coordinates shared technology and bundle offerings.

102. On information and belief, Hulu runs the service according to product, financial, technical, and distribution direction provided by the Disney entities, and its platform conduct furthers both Hulu's own interests and Disney's shared subscription and advertising strategy.

103. On information and belief, ESPN serves as an agent of The Walt Disney Company and DMED with respect to operating, financing, marketing, and monetizing the ESPN streaming services, and as an agent of Disney DTC LLC and Disney Streaming Services LLC when those entities support the content, subscriber, or promotional activities of the ESPN streaming services.

104. On information and belief, ESPN serves as an agent of Disney Entertainment & Sports LLC with respect to the technology, applications, delivery arrangements, and distribution contracts used for the ESPN streaming services, and as an agent of BAMTech and Hulu when it coordinates shared services and bundles.

105. On information and belief, ESPN performs its work for the ESPN streaming services under authority delegated by the Disney entities and in coordination with the shared technology and distribution organizations, and its use of those delegated services furthers the commercial goals of every entity involved in the ESPN streaming services.

106. On information and belief, The Walt Disney Company in turn serves as an agent of DMED, Disney DTC LLC, Disney Streaming Services LLC, Disney Entertainment & Sports LLC, Disney Electronic Content, Inc., BAMTech, LLC, Hulu, LLC, and ESPN, LLC when its shared executives, corporate functions, facilities, and enterprise systems do work for those entities. In this way, the parent provides services and direction on the subsidiaries' behalf in connection with the accused platforms.

107. On information and belief, the parent's work as agent encompasses enterprise budgeting, executive supervision, legal and compliance coordination, procurement, technology planning, and communications. On information and belief, the parent provides these services expecting the subsidiaries to use them in operating and monetizing their streaming services.

108. On information and belief, every agency relationship alleged above was material to the operation of at least one Disney platform. Acting through their agents, the Defendants selected and deployed the video technology, arranged for delivery, attracted subscribers, and earned revenue from the resulting streams.

109. On information and belief, none of the Defendants function as an arm's length vendor with respect to the accused platforms. On information and belief, each Defendant had authority to make decisions for, procure services for, direct personnel for, or otherwise act on behalf of one or more other Defendants in connection with the streaming activities alleged in this Complaint.

**C. VICARIOUS LIABILITY**

110. On information and belief, the entities that control, supervise, or direct the streaming businesses retain the power to decide how the accused platforms are designed and run. These controlling relationships are substantive, not nominal; they govern the services that process the video and produce the revenues at issue.

111. On information and belief, The Walt Disney Company controls DMED's streaming-related

activities. The parent directs the objectives, resources, and structure of DMED's work for Disney+, Hulu, Hulu Live, and the ESPN streaming services, and it may require DMED to adopt or abandon particular platform practices.

112. On information and belief, The Walt Disney Company makes the benefits it provides to DMED, including funding, personnel, shared services, and access to Disney content, contingent on DMED's performance of the streaming functions. The parent also dictates when and how DMED launches, modifies, distributes, and promotes the platforms.

113. On information and belief, The Walt Disney Company profits from DMED's platform activities through the revenue and enterprise value generated by subscriptions, advertising, distribution, and content consumption. Although the parent can halt or modify DMED's use of the accused coding practices, on information and belief it has not done so.

114. On information and belief, because The Walt Disney Company controls DMED, benefits from DMED's conduct, and has the power to prevent that conduct, The Walt Disney Company is vicariously liable for DMED's infringing streaming activities and for the acts DMED directs through the other Defendants.

115. On information and belief, The Walt Disney Company controls the content, marketing, contracting, and infrastructure-procurement work Disney DTC LLC performs for the platforms. The parent directs its business priorities and may dictate which content and delivery arrangements Disney DTC LLC uses.

116. On information and belief, The Walt Disney Company provides Disney DTC LLC with the personnel, content access, funding, corporate systems, and commercial opportunities its work requires, and those benefits are contingent on Disney DTC LLC executing the direct-to-consumer plans, including the timing and manner of the platforms' distribution and marketing.

117. On information and belief, The Walt Disney Company profits from the content and distribution work of Disney DTC LLC and could instruct that entity to stop the accused workflows or replace the related technology. On information and belief, the parent has not used that power.

118. On information and belief, The Walt Disney Company is accordingly vicariously liable for Disney DTC LLC's infringing acts and for the infringing acts Disney DTC LLC causes or facilitates through content distribution, cloud procurement, CDN arrangements, and affiliate operations.

119. On information and belief, The Walt Disney Company controls the finance and marketing work Disney Streaming Services LLC performs for all four platforms, and it approves or establishes the commercial goals that govern when and how the entity promotes subscriptions and bundles.

120. On information and belief, The Walt Disney Company supplies Disney Streaming Services LLC with personnel, budgets, brand access, and enterprise marketing channels, and those benefits depend on the entity executing the parent's subscription-growth plans in the prescribed manner and on the prescribed timeline.

121. On information and belief, The Walt Disney Company profits from the subscriber growth and platform usage Disney Streaming Services LLC generates and can halt or revise the entity's marketing of services that rely on the accused technology. On information and belief, the parent has let those activities continue.

122. On information and belief, The Walt Disney Company is vicariously liable for the infringing platform activities of Disney Streaming Services LLC because the parent controls that entity, benefits from its work, and has retained the power to direct or stop the relevant conduct.

123. On information and belief, The Walt Disney Company controls the technology organization of Disney Entertainment & Sports LLC and its product-development priorities for Disney+, Hulu, Hulu Live, and the ESPN streaming services, and the parent may dictate the technical requirements,

release schedule, and manner of operation for the systems those platforms use.

124. On information and belief, The Walt Disney Company provides Disney Entertainment & Sports LLC with engineers, funding, corporate systems, and access to the services whose technology it builds, and those benefits are contingent on building and maintaining the infrastructure in the manner and on the schedule Disney's streaming businesses require.

125. On information and belief, The Walt Disney Company profits from the technology Disney Entertainment & Sports LLC builds and can compel the entity to disable or redesign an infringing system. On information and belief, the parent has kept allowing the technology to be used across the services.

126. On information and belief, The Walt Disney Company is vicariously liable for the infringing design, maintenance, and technology-support activities of Disney Entertainment & Sports LLC, including the use of shared back-end services in the accused platforms.

127. On information and belief, The Walt Disney Company controls the technology work of BAMTech and can dictate the products, priorities, and release timing for BAMTech systems used by the streaming businesses, as well as BAMTech's role in the ESPN streaming website and service architecture.

128. On information and belief, The Walt Disney Company furnishes BAMTech with funding, platform requirements, brand access, and business opportunities involving Disney+ and Hulu, and those benefits are linked to BAMTech's ongoing performance of technology and delivery work in the manner the Disney services require.

129. On information and belief, The Walt Disney Company benefits from the streams and subscriptions BAMTech enables and can require BAMTech to stop or change technology that uses the accused coding practices. On information and belief, the parent has not imposed that requirement.

130. On information and belief, The Walt Disney Company is vicariously liable for the infringing development, maintenance, and platform-support activities of BAMTech, including the work it performs for Disney+ and the ESPN streaming services.

131. On information and belief, The Walt Disney Company controls Hulu's operation of Hulu and Hulu Live, including the resources, technology, content, and distribution arrangements those services use, and it can set the timing and manner of Hulu's product, marketing, and streaming decisions.

132. On information and belief, The Walt Disney Company provides Hulu with funding, personnel, content relationships, brand support, and shared technology so that Hulu will operate and promote Hulu and Hulu Live in line with the parent's platform plans.

133. On information and belief, The Walt Disney Company profits from Hulu and Hulu Live and can instruct Hulu to cease using the infringing coding and delivery workflows. On information and belief, the parent has not exercised that power to prevent the conduct alleged in this Complaint.

134. On information and belief, The Walt Disney Company is vicariously liable for Hulu's infringing operation of Hulu and Hulu Live, including its use of shared technology and delivery infrastructure.

135. On information and belief, The Walt Disney Company controls ESPN's management, content, finance, marketing, and operation of the ESPN streaming services, and it establishes or approves when and how those services are presented, distributed, promoted, and supported.

136. On information and belief, The Walt Disney Company furnishes ESPN with content, personnel, funding, brand support, and access to the shared platform and distribution organizations, and those benefits are contingent on ESPN continuing to carry out activities for the ESPN streaming services on the schedule and through the systems Disney selects.

137. On information and belief, The Walt Disney Company profits from subscriptions to the ESPN streaming services and from related advertising and distribution, and it can direct ESPN to end the Accused Instrumentalities. On information and belief, it has not instructed ESPN to stop using the relevant technology.

138. On information and belief, The Walt Disney Company is vicariously liable for ESPN's infringing management and operation of the ESPN streaming services, including acts carried out through the shared technology, account, and distribution systems.

139. On information and belief, DMED controls the platform-related work of Disney DTC LLC, Disney Streaming Services LLC, and Disney Entertainment & Sports LLC. It allocates responsibilities, coordinates their activities, and can decide when and how those entities perform work for Disney+, Hulu, Hulu Live, and the ESPN streaming services.

140. On information and belief, DMED makes funding, access to shared services, and business opportunities contingent on the subsidiaries carrying out their assigned platform work, and DMED reaps the benefits of that work through the services' operating results, distribution reach, and subscriber growth.

141. On information and belief, DMED has the power to cease or redirect the subsidiaries' use of the accused technology and, on information and belief, has not exercised it. DMED is accordingly vicariously liable for the infringing conduct of Disney DTC LLC, Disney Streaming Services LLC, and Disney Entertainment & Sports LLC.

142. On information and belief, DMED oversees the content, affiliate, procurement, and cloud-related activities of Disney DTC LLC and directs how those activities support the services, and DMED may require Disney DTC LLC to modify or discontinue a delivery or coding workflow.

143. On information and belief, DMED benefits from the content and infrastructure work of

Disney DTC LLC and is vicariously liable for the resulting infringement because DMED directs that work, controls when and how it is done, and has not stopped it from continuing.

144. On information and belief, DMED oversees the budgets and marketing programs of Disney Streaming Services LLC and decides how those programs are deployed for the platforms, and it may make financial support and campaign resources contingent on performance of the assigned activities.

145. On information and belief, DMED profits from the subscriber activity Disney Streaming Services LLC generates and could compel changes to the campaigns promoting the accused platforms. DMED is vicariously liable for the infringing finance and marketing conduct of Disney Streaming Services LLC.

146. On information and belief, DMED oversees the engineering roadmap, platform systems, and service releases of Disney Entertainment & Sports LLC, may set the timing and manner of development, and can compel the technology organization to keep or replace a given system.

147. On information and belief, DMED obtains the operational and financial benefits of the technology Disney Entertainment & Sports LLC maintains and can instruct it to cease the accused uses. DMED is vicariously liable for the infringing technology activities of Disney Entertainment & Sports LLC.

148. On information and belief, DMED oversees or coordinates the shared technology and platform work of Disney Electronic Content, BAMTech, Hulu, and ESPN, and it can set priorities, allocate resources, and dictate the timing and manner of their streaming activities.

149. On information and belief, DMED obtains the commercial and operational benefits of the work of Disney Electronic Content, BAMTech, Hulu, and ESPN and can compel those entities to stop using the accused technology. On information and belief, DMED has not used that authority and is vicariously liable for the resulting infringement.

150. On information and belief, Disney Streaming Services LLC benefits from the subscriber growth and revenue those entities generate and can direct changes to the marketing or finance practices supporting the Accused Instrumentalities. On information and belief, it has not done so and is vicariously liable for the associated infringement.

151. On information and belief, Disney Entertainment & Sports LLC controls the technology work of Disney Electronic Content, BAMTech, Hulu, and ESPN when they use the shared streaming infrastructure, and it sets the technical requirements, releases, and operating methods for the systems it builds or maintains.

152. On information and belief, Disney Entertainment & Sports LLC makes access to its technology contingent on the other entities' performance of their platform work and profits from the continued use of those systems. Although it can disable or redesign a shared service, on information and belief it has not done so.

153. On information and belief, Disney Entertainment & Sports LLC is vicariously liable for the infringing technology and platform-support conduct that Disney Electronic Content, BAMTech, Hulu, and ESPN carry out through the shared systems.

154. On information and belief, ESPN controls or directs BAMTech's work on the ESPN streaming website and related subscriber technology. ESPN specifies the product requirements and timing for features of the ESPN streaming services and can compel BAMTech to change or discontinue the technical conduct.

155. On information and belief, ESPN makes BAMTech's access to content from the ESPN streaming services, branding, and business opportunities contingent on BAMTech performing its assigned development and maintenance work, and ESPN profits from the subscribers and streams that result.

156. On information and belief, ESPN has the power to discontinue BAMTech's use of the accused technology and, on information and belief, has not exercised it. ESPN is accordingly vicariously liable for the infringing acts BAMTech performs for the ESPN streaming services.

**D. INDUCEMENT**

157. On information and belief, each Defendant actively encourages conduct that results in the use of the Accused Instrumentalities. The inducement includes coordinating entities whose systems process the video.

158. Defendants induce infringement by directing that video be encoded on cloud platforms such as AWS EC2, S3, Dynamo, and Kinesis. Ex. 9 (https://news.ycombinator.com/item?id=13541980). On information and belief, where video is encoded and/or decoded on cloud platforms, Defendants expressly instruct the third-party cloud operators to encode and/or decode video in an infringing manner, for instance by setting encoder parameters and by requiring use of the HEVC codec.

159. The Walt Disney Company induces the other Defendants by funding, directing, staffing, and coordinating the design, development, distribution, and operation of the accused platforms. It encourages those entities to perform the technical and commercial acts necessary to create and deliver the streams.

160. The Walt Disney Company also induces infringement through bundle marketing and cross-promotion. For example, the subscription pathways for Disney+ and the ESPN streaming services steer users toward Hulu and the other services, so that the shared technology and coding workflows are used for additional streams.







Ex. 10, https://www.disneyplus.com/welcome/disney-hulu-espn-bundle.

161. The Walt Disney Company has been on notice of the Patents-in-Suit since the September 16, 2026 and October 14, 2026 communications from Access Advance, and through the communications and patent materials described in this Complaint. On information and belief, it has acted knowing of Tagivan's rights or while willfully blind to the fact that the induced acts use the claimed video-coding technology.

162. On information and belief, DMED induces the other Defendants by giving them platform

responsibilities, financing their work, and coordinating the technology, content, sales, and delivery functions they carry out, thereby actively supporting the acts through which encoded video is created and transmitted.

163. On information and belief, DMED induces infringement through bundle offers and cross-service placement, with its distribution pages and sales channels guiding users among Disney+, Hulu, Hulu Live, and the ESPN streaming services, including by sending subscribers from one service's website to another service's enrollment pathway.

164. On information and belief, DMED received notice of the Patents-in-Suit through the same notice provided to Disney and the other operating entities, or else was willfully blind to Tagivan's patent rights. On information and belief, DMED nonetheless intended for the platforms and their service providers to keep performing the induced acts.

165. On information and belief, Disney DTC LLC induces infringement by curating and overseeing content for Disney+ and Hulu, acting as a party to the Disney+, ESPN, and Hulu subscriber agreement, securing access to programming, steering users to platform applications, and controlling how the services are accessed and used. It encourages subscribers to stream through applications and connected devices that use the accused coding and delivery processes.

166. On information and belief, Disney DTC LLC induces the other Defendants by negotiating distribution agreements, procuring CDN and cloud services, and running affiliate and third-party distribution operations, all affirmative acts that fund and facilitate the design and operation of the streaming systems.

167. On information and belief, Disney DTC LLC induces infringement through affiliate marketing and bundle placement that shift subscribers among Disney+, Hulu, Hulu Live, and the ESPN streaming services, directing or encouraging users who start on one service to sign up for

another that depends on the same or related coding systems.

168. On information and belief, Disney DTC LLC received notice of the Patents-in-Suit through the Disney enterprise's notice and licensing communications, or else was willfully blind to Tagivan's rights, and it nonetheless intended for its content and distribution activities to cause the accused platform acts to continue.

169. On information and belief, Disney Streaming Services LLC induces the other Defendants by allocating budgets, funding campaigns, and coordinating platform launches and operations, thereby supporting the design, development, and distribution decisions that put the accused technology into service.

170. On information and belief, Disney Streaming Services LLC induces bundle use by marketing combined access to Disney+, Hulu, Hulu Live, and the ESPN streaming services and by steering customers between the services, with campaigns designed so that a subscriber's use of one platform increases use of the others.

171. On information and belief, Disney Streaming Services LLC had notice of the Patents-in-Suit or was willfully blind to Tagivan's rights. On information and belief, it nonetheless intended for its own campaigns, and the other Defendants' work, to induce the infringing streaming acts.

172. On information and belief, Disney Entertainment & Sports LLC induces the other Defendants by developing, maintaining, and deploying the shared back-end services they rely on supplying the technology and coordinating the releases that allow those entities to run the platforms and process encoded video.

173. On information and belief, Disney Entertainment & Sports LLC induces cross-use by building common functions that let users move among Disney+, Hulu, Hulu Live, and the ESPN streaming services. Those shared account, application, delivery, and playback features are what

make the bundle and cross-promotion strategy work.

174. On information and belief, Disney Entertainment & Sports LLC had notice of the Patents-in-Suit or was willfully blind to Tagivan's rights, and it continued developing and maintaining the shared platform systems with the intent of supporting the induced acts.

175. On information and belief, BAMTech induces the other Defendants by building and maintaining the technology they use to operate the services, including subscriber systems, media catalogs, delivery connections, and playback tools, which supports the design and operation of the platforms and the processing of encoded video.

176. On information and belief, BAMTech induces cross-use by supporting technology shared among Disney+, Hulu, Hulu Live, and the ESPN streaming services and by helping with bundle and account functionality, and its systems help steer users toward additional services once they subscribe to one Disney offering.

177. On information and belief, BAMTech had notice of the Patents-in-Suit or was willfully blind to Tagivan's rights. On information and belief, it kept developing and providing the technology intending that Disney entities would perform the induced acts.

178. Hulu induces the other Defendants by running Hulu and Hulu Live on shared content, cloud, CDN, account, and video-delivery systems, and its ongoing operation requires the other entities to maintain the technology and services that process the accused streams.

179. Hulu induces cross-use by promoting bundles that combine Disney+, Hulu, Hulu Live, and the ESPN streaming services, using promotional pathways designed to move customers into related services that rely on common or coordinated coding and delivery infrastructure.

## Hulu + Live TV plans

| Hulu + Live TV Plans* | Services | Price |
|---|---|---|
| Hulu + Live TV, Disney+, and ESPN Select | • Live TV<br>• Hulu (With Ads)<br>• Disney+ (With Ads)<br>• ESPN Select (With Ads) | Monthly: $89.99<br>Select plan |
| Hulu Premium + Live TV, Disney+ Premium, and ESPN Select | • Live TV<br>• Hulu (No Ads)<br>• Disney+ (No Ads)*<br>• ESPN Select (With Ads) | Monthly: $99.99<br>Select plan |

Ex. 11, https://help.hulu.com/article/hulu-how-much-does-hulu-cost#disney-plus-bundle-plans.

180. Hulu had notice of the Patents-in-Suit or was willfully blind to Tagivan's rights. On information and belief, it kept operating and promoting Hulu and Hulu Live intending that supporting entities would perform the induced acts.

181. ESPN induces the other Defendants by providing content plans, financing, marketing direction, and operating requirements for the ESPN streaming services, and by coordinating with technology and distribution teams to keep the services running and to process sports video through the accused systems.

182. ESPN induces cross-service use by pointing subscribers of the ESPN streaming services to Disney+ and Hulu bundle offers and by taking referrals from those platforms, referrals that are meant to increase use of the same or related coding and delivery systems across the Disney services.




Ex. 12, https://plus.espn.com/.

183. ESPN had notice of the Patents-in-Suit or was willfully blind to Tagivan's rights. On information and belief, it kept operating and promoting the ESPN streaming services intending that BAMTech and the other Defendants would perform the induced acts.

184. On information and belief, each Defendant engaged in its inducement with knowledge of the Patents-in-Suit, actual awareness of the patent allegations, or deliberate avoidance of confirming whether the technology was patented. Each Defendant intended the platform conduct to take place and intended its customers or affiliates to use the systems as alleged.

185. On information and belief, the Disney+ website induces infringement by displaying offers

for Hulu and the ESPN streaming services next to Disney+ subscription options and sending visitors to related enrollment pages, and these referrals encourage additional use of the same family of streaming systems.

186. On information and belief, the Hulu website induces infringement by promoting bundles that include Disney+ and the ESPN streaming services and sending users to sign-up or account pages for those services, so that Hulu's customer-acquisition efforts induce further acts using coordinated video infrastructure.

187. On information and belief, the ESPN streaming website induces infringement by steering subscribers toward Disney+ and Hulu bundles or presenting those services as companion offerings, which encourages a subscriber who has already requested content from the ESPN streaming services to request and receive more accused streams.

188. On information and belief, the bundle checkout process induces infringement by combining payment, account authentication, and service activation while encouraging simultaneous use of several platforms, an integrated customer experience that makes the induced streaming acts both foreseeable and commercially desirable.

189. On information and belief, the Defendants induce the cloud, CDN, content, and technology providers supporting their platforms by choosing and paying them, furnishing specifications, and directing how their services are integrated into Disney's streaming environment.

190. On information and belief, these inducements directed at providers are affirmative, because the Defendants do not simply buy generic services; they dictate the functions, interfaces, workflows, and delivery outcomes the accused platforms require.

191. On information and belief, every Defendant knew that the platforms would be used repeatedly and at scale, and that the resulting streams would rely on the coding and delivery

processes described above.

192. On information and belief, the Defendants' shared employees and executives serve as a common source of instructions for the accused platform acts, and their authority across entities supports the inference that each Defendant intended and encouraged the conduct performed through the others.

193. On information and belief, although the Defendants could have instructed customers, affiliates, and service providers to stop using a given coding or delivery workflow, they continued promoting and supporting those workflows after learning of Tagivan's rights.

194. On information and belief, the induced acts take place in the ordinary course of the Disney platforms' operation, not through some collateral or accidental use. The subscriptions, applications, shared systems, and technical services are built to make the accused streaming activity ongoing and repeatable.

195. The conduct alleged in this section consists of affirmative steps that encourage direct infringement, not mere passive ownership or receipt of revenue. The Defendants selected the products, services, commercial pathways, and technical arrangements that enable the accused streaming activity.

**E. THE ITU'S COMMON PATENT POLICY**

196. The International Telecommunication Union ("ITU") is a UN agency that coordinates standardization of information and communication technology. Originally established in 1865, it brings together governments, private companies, and technical experts to develop international standards, allocate radio spectrum, and improve global connectivity. One part of the ITU, known as ITU-T, develops technical standards (called "Recommendations") to ensure global interoperability of communication systems.

197. One of these Recommendations is H.265, or High Efficiency Video Coding ("HEVC").

H.265 provides more efficient coding than previous video coding standards.

198. The ITU has a Common Patent Policy regarding contributions that are ultimately included in a Recommendation and may be covered by one or more patent claims.

199. The ITU's patent policy explains:

> 1. The ITU Telecommunication Standardization Bureau (TSB), the ITU Radiocommunication Bureau (BR) and the offices of the CEOs of ISO and IEC are not in a position to give authoritative or comprehensive information about evidence, validity or scope of patents or similar rights, but it is desirable that the fullest available information should be disclosed. Therefore, any party participating in the work of ITU, ISO or IEC should, from the outset, draw the attention of the Director of ITU-TSB, the Director of ITU-BR, or the offices of the CEOs of ISO or IEC, respectively, to any known patent or to any known pending patent application, either their own or of other organizations, although ITU, ISO or IEC are unable to verify the validity of any such information.
>
> 2. If a Recommendation | Deliverable is developed and such information as referred to in paragraph 1 has been disclosed, three different situations may arise:
>
> 2.1 The patent holder is willing to negotiate licences free of charge with other parties on a non-discriminatory basis on reasonable terms and conditions. Such negotiations are left to the parties concerned and are performed outside ITU-T/ITU-R/ISO/IEC.
>
> 2.2 The patent holder is willing to negotiate licences with other parties on a non-discriminatory basis on reasonable terms and conditions. Such negotiations are left to the parties concerned and are performed outside ITU-T/ITU-R/ISO/IEC.
>
> 2.3 The patent holder is not willing to comply with the provisions of either paragraph 2.1 or paragraph 2.2; in such case, the Recommendation | Deliverable shall not include provisions depending on the patent.
>
> 3. Whatever case applies (2.1, 2.2 or 2.3), the patent holder has to provide a written statement to be filed at ITU-TSB, ITU-BR or the offices of the CEOs of ISO or IEC, respectively, using the appropriate "Patent Statement and Licensing Declaration" form. This statement must not include additional provisions, conditions, or any other exclusion clauses in excess of what is provided for each case in the corresponding boxes of the form.

Ex. 13 (Common Patent Policy), https://www.itu.int/en/ITU-T/ipr/Pages/policy.aspx.

200. The ITU also publishes Guidelines for implementation of its patent policy. According to these Guidelines, a declaration "declares the willingness to license in case part(s) or all of any proposals contained in contributions submitted by the organization are included in ITU-T Recommendation(s) and the included part(s) contain items that have been patented or for which patent applications have been filed and whose use would be required to implement ITU-T Recommendation(s)." Ex. 14 (Patent Policy Guidelines) at 3.

201. Plaintiff is prepared to grant licenses for implementations of the H.265 Recommendation to any patent claims essential to the H.265 Recommendation on reasonable and non-discriminatory

("RAND") terms and conditions as set forth in the ITU Common Patent Policy.

### F. LICENSE OFFERS TO DISNEY

202. Tagivan participates in patent pools. Patent pools are arrangements where multiple patent holders license their rights collectively to a pool, which then licenses the patents out collectively. This reduces transaction costs, lowers barriers to adoption of standards, and makes it easier for implementers to license technologies and bring them to market.

203. Tagivan offers licenses to its H.265-related patents, including the Patents-in-Suit, at reasonable rates through Access Advance's Video Distribution Patent ("VDP") pool.

204. On information and belief, Access Advance began negotiations with Disney in 2024, when it sent Disney the first communication regarding discussion of the VDP pool. On information and belief, Access Advance provided information about its licensing programs and offered Disney a license at standard rates. Access Advance continued to negotiate with Disney in 2025 and 2026, but Disney did not make any offer or counterproposal. On information and belief, on April 16, 2026, Access Advance informed Disney that Tagivan was a member of the VDP pool. Further, on information and belief, on September 16, 2026 Access Advance sent Disney a patent list including the '001 and '280 Patents, and on October 14, 2026 Access Advance sent Disney a patent list including each of the Patents-in-Suit.

205. Disney has been offered a license to the Patents-in-Suit under reasonable and non-discriminatory terms through the VDP pool. Access Advance explained to Disney that the VDP Pool license was based on reasonable and non-discriminatory terms and provided an efficient licensing solution for Disney. Disney, however, did not take a license, and did not seek a bilateral license from Tagivan.

206. Disney's continued unlicensed use of Plaintiff's Patents-in-Suit has prompted Plaintiff to bring this action.

## PLAINTIFF'S ASSERTED PATENTS

207. Disney has known about the Patents-in-Suit since at least September 16, 2026 or October 14, 2026, when Access Advance provided patent lists for the VDP pool.

### A. U.S. Patent No. 8,781,001

208. Plaintiff owns by assignment the entire right, title, and interest in and to U.S. Patent No. 8,781,001. The '001 Patent, entitled "Image coding method, image coding apparatus, image decoding method and image decoding apparatus," issued on July 15, 2014, to inventors Hisao Sasai, Takahiro Nishi, Youji Shibahara, Toshiyasu Sugio, Kyoko Tanikawa, Toru Matsunobu, and Kengo Terada. Plaintiff owns all rights to the '001 Patent necessary to bring this action, including the rights to recover for pre-suit infringement to the fullest extent under any provision of law, including 35 U.S.C. §§ 284-287. The '001 Patent issued from U.S. Patent Application No. 13/669,733, filed on November 6, 2012, and claims priority to Provisional Application No. 61/556,398, filed on Nov. 7, 2011. A true and correct copy of the '001 Patent is attached as Exhibit 1 and incorporated by reference herein.

209. The '001 Patent is not directed to merely an abstract idea or any patent-ineligible concept. Instead, the '001 Patent is directed to novel and unconventional improvements to the context-adaptive arithmetic coding of last position information in the field of digital video coding. The '001 Patent provides improvements over prior entropy coding techniques that result in substantial benefits to coding efficiency and reduced memory requirements.

210. In video coding, quantized transform coefficients in a current block are scanned in a predetermined order, and information indicating the position of the last non-zero coefficient in the scan order (last position information) is binarized and coded by context adaptive binary arithmetic coding. '001 Patent at 1:60-67.

211. A persistent problem with conventional context adaptive binary arithmetic coding of last

position information was that appropriate switching among contexts was difficult. *Id*. at 2:20-29. For example, when the same context was used for binary symbols at bit positions that are significantly different in probability of symbol occurrence, the accuracy of predicting the probability of symbol occurrence decreased, and thus the coding efficiency also decreased. *Id*.

212. The ’001 Patent overcame these technical challenges by employing an unconventional method of context switching in which the binary symbol at the last bit position of the first signal is arithmetically encoded using a context exclusive to the last bit position, when the first signal has the predetermined maximum length. *Id*. at 23:18-34.

213. In certain embodiments, for example, the binary symbol at the last bit position of the first signal has a feature in symbol occurrence different from that of the binary symbols at the other bit positions. In view of this, it is possible to increase the coding efficiency by arithmetically coding the binary symbol at the last bit position of the first signal using the context exclusive to the last bit position. *Id*. at 9:14-24.

214. Furthermore, the ’001 Patent teaches that each of binary symbols at two or more bit positions other than the last bit position of the first signal can be arithmetically coded using a context common to the two or more bit positions. This reduces the number of contexts as compared to the case of using a different context for each bit position, and thus the capacity required of the memory can be reduced. *Id*. at 9:29-35.

215. The ’001 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in increased coding efficiency and reduced memory requirements. For example, by assigning an exclusive context to the last bit position—which has a unique role in signaling the presence of the suffix—the patent increases the accuracy of probability prediction for that critical symbol, thereby improving coding efficiency. *Id*. at 9:14-35,

40:5-30 (cl. 1). By using a common context for two or more other bit positions, the patent reduces the total number of contexts required, thereby reducing the capacity required of the memory. *Id.*

216. Conventional technology prior to the ’001 Patent was not capable of this efficiency, because it did not differentiate the context for the last bit position of the prefix from the contexts for other bit positions, despite the last bit position’s unique statistical characteristics. The ’001 Patent recognizes and solves these specific technological problems that plagued the conventional technology at the time. The ’001 Patent’s approach of using a context exclusive to the last bit position while sharing a context among other bit positions was a significant advancement over existing technology.

217. The novel solution of the ’001 Patent was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including binarizing last position information to generate a binary signal which includes a first signal having a length smaller than or equal to a predetermined maximum length and optionally a second signal; first encoding for arithmetically encoding each of binary symbols included in the first signal using a context switched among a plurality of contexts according to a bit position of the binary symbol; and second encoding for arithmetically encoding the second signal using a fixed probability, wherein a binary symbol at a last bit position of the first signal is arithmetically encoded using a context exclusive to the last bit position when the first signal has the predetermined maximum length, and each of binary symbols at two or more bit positions other than the last bit position of the first signal is arithmetically encoded using a context common to the two or more bit positions, was not well-understood, routine, or conventional.

218. The ’001 Patent’s context switching is tied to the structure of the binarized last position information, rather than being based on a generic data-processing rule. In particular, the exclusive

context is used when the first signal reaches the predetermined maximum length, the condition that signals the possible presence of the second signal.

219. The claimed arrangement improves the operation of the image coding method itself by coordinating binarization, context-adaptive arithmetic coding of the first signal, and fixed-probability coding of the second signal. These interrelated operations provide a concrete technological solution to the identified coding-efficiency and memory-capacity problems.

220. The unconventional nature and technological improvements of the ’001 Patent were recognized in the industry. For example, on or around November 8, 2011, a group including many of the inventors of the ’001 Patent submitted JCTVC-G520, titled “Non-CE11: Modified Context Derivation for last coefficient flag” to the Joint Collaborative Team on Video Coding (JCT-VC). Ex. 25. Certain proposals from this submission were ultimately adopted, based on their technical merits, in implementations of H.265 video coding such as those used by Disney today, and referenced in later JCT-VC submissions such as JCTVC-G942, titled “Non-CE11: Cross-check of Modified Context Derivation for last coefficient flag (JCTVC-G520).” Ex. 15.

221. Plaintiff (and any prior owners of the ’001 Patent) complied with any applicable marking requirements under 35 U.S.C. § 287 as to the ’001 Patent at least because the asserted claims include method claims that do not require marking and/or there is nothing to mark.

**B. U.S. Patent No. 10,334,280**

222. Plaintiff owns by assignment the entire right, title, and interest in and to U.S. Patent No. 10,334,280. The ’280 Patent, entitled “Image coding method, image coding apparatus, image decoding method and image decoding apparatus,” issued on June 25, 2019, to inventors Hisao Sasai, Takahiro Nishi, Youji Shibahara, Toshiyasu Sugio, Kyoko Tanikawa, Toru Matsunobu, and Kengo Terada. Plaintiff owns all rights to the ’280 Patent necessary to bring this action, including the rights to recover for pre-suit infringement to the fullest extent under any provision of law, including 35

U.S.C. §§ 284-287. The ’280 Patent issued from U.S. Patent Application No. 15/623,588, filed on June 15, 2017, and claims priority to a chain of applications including Provisional Application No. 61/556,398, filed on November 7, 2011. A true and correct copy of the ’280 Patent is attached as Exhibit 2 and incorporated by reference herein.

223. The ’280 Patent is not directed to merely an abstract idea or any patent-ineligible concept. Instead, like the ’001 Patent, the ’280 Patent is directed to novel and unconventional improvements to the context-adaptive arithmetic coding of last position information in the field of digital video coding. The ’280 Patent shares a common specification with the ’001 Patent, and its claims are directed to similar technological improvements described above in Paragraphs 208-219, which are incorporated by reference here.

224. As with the ’001 Patent, the ’280 Patent overcame technical challenges using an unconventional method, and provides a specific technological improvement to the functionality and capabilities of video coding technology. Conventional technology prior to the ’280 Patent was not capable of these improvements. The novel solution of the ’280 Patent was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. And the unconventional nature of this solution was recognized in the industry, for example through proceedings at the JCT-VC. See Paragraphs 208-219.

225. Plaintiff (and any prior owners of the ’280 Patent) complied with any applicable marking requirements under 35 U.S.C. § 287 as to the ’280 Patent at least because the asserted claims include method claims that do not require marking and/or there is nothing to mark.

**C. U.S. Patent No. 11,570,469**

226. Plaintiff owns by assignment the entire right, title, and interest in and to U.S. Patent No. 11,570,469 (the "’469 Patent"). The ’469 Patent, entitled "Moving picture coding method, moving

picture coding apparatus, moving picture decoding method, and moving picture decoding apparatus," issued on January 31, 2023, to inventors Toshiyasu Sugio, Takahiro Nishi, Youji Shibahara, Kyoko Tanikawa, Hisao Sasai, Toru Matsunobu, and Kengo Terada. Plaintiff owns all rights to the '469 Patent necessary to bring this action, including the rights to recover for pre-suit infringement to the fullest extent under any provision of law, including 35 U.S.C. §§ 284-287. The '469 Patent issued from U.S. Patent Application No. 17/215,065, filed on March 29, 2021, and claims priority to a chain of applications including Provisional Application No. 61/554,598, filed on November 2, 2011. A true and correct copy of the '469 Patent is attached as Exhibit 3 and incorporated by reference herein.

227. The '469 Patent is not directed to merely an abstract idea or any patent-ineligible concept. Instead, the '469 Patent is directed to novel and unconventional improvements to the generation of motion vector predictor candidates used in inter prediction in the field of digital video coding. The '469 Patent provides improvements over prior motion vector prediction techniques that result in substantial benefits to the processing speed of video encoding and decoding.

228. In video coding, inter prediction coding processing reduces the data required to code a picture by exploiting temporal redundancy between pictures. '469 Patent, 1:16-21. A motion vector predictor can be used when coding or decoding a motion vector of a current block, and one or more motion vector predictor candidates are generated from motion vectors of adjacent blocks in different directions—for example, blocks adjacent to the current block in a leftward direction (first adjacent blocks) and blocks adjacent in an upward direction (second adjacent blocks).

229. A persistent problem with motion vector predictor generation was that the processing of the second group of adjacent blocks (upward direction) could not proceed until processing of the first group (leftward direction) was complete. Id. at Fig. 13, 15:22-33 (providing a "Comparative

Example”). Specifically, whether scaling processing had been executed on the first group was a determination condition for whether to perform scaling on the second group. Id. at 15:34-37. Because scaling processing requires great processing load, it was limited to being performed once, and the system waited for the first group’s processing to complete before determining whether scaling was needed for the second group. Id. at 15:38-42. This serial dependency prevented the parallel generation of motion vector predictor candidates from both adjacent block groups, limiting the processing speed of coding and decoding.

230. The ’469 Patent overcame these technical challenges by employing an unconventional method for generating motion vector predictor candidates from the left adjacent blocks and the upper adjacent blocks. Id. at claim 2. For the left adjacent blocks, a motion vector that is available without scaling is used as a candidate if one exists; otherwise, a motion vector that can be made available by scaling is scaled and used as a candidate. Id.; see also id. at Figs. 8, 9A-9B, 14, 20:8-14. For the upper adjacent blocks, a motion vector that is available without scaling is likewise used as a candidate if one exists. Id. at claim 2; see also id. at 20:15-20. If no such motion vector exists, however, whether to scale a motion vector of the upper adjacent blocks depends on whether the left adjacent blocks include one or more inter-predicted blocks rather than on whether scaling was already performed on the left adjacent blocks. Id. at claim 2. Specifically, the motion vector of the upper adjacent blocks is scaled to generate a candidate only when the left adjacent blocks do not include an inter-predicted block, and no candidate is generated from the upper adjacent blocks when the left adjacent blocks include at least one inter-predicted block. Id.; see also id. at Fig. 14, 20:3-33. This determination can be made without waiting for the scaling processing on the left adjacent blocks to complete, enabling parallel execution. Id. at 20:41-49; see also id., 24:33-37 (“In other words, the coding control unit 108 … can determine whether to perform scaling processing on the block group

B, without using the result of processing on the block group A."), 24:65-25:3 ("…in steps S620 and S820, processing on the block group B can be executed without using the result of processing on the block group A, and processing on the block group A and processing on the block group B can be performed in parallel.")

231. The '469 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in increased processing speed for coding and decoding moving pictures using inter prediction. Id. at 39:66-40:3. By replacing the serial dependency on the left adjacent blocks' scaling result with a determination based on whether the left adjacent blocks include an inter-predicted block, the patent enables parallel generation of motion vector predictor candidates from both the left and upper adjacent blocks, while still limiting how often computationally expensive scaling processing is performed. Id. at 20:41-59 ("increase the processing speed without increasing processing load (without increasing the number of times scaling processing is performed)"), 24:65-25:3. This benefit is particularly significant for high-throughput applications such as high-definition video that require processing large amounts of image data at high speed.

232. Conventional technology prior to the '469 Patent was not capable of this processing speed improvement, because generating motion vector predictor candidates from the upper adjacent blocks required waiting for processing on the left adjacent blocks to complete. The '469 Patent recognizes and solves these specific technological problems that plagued the conventional technology at the time. The '469 Patent's approach of conditioning scaling of a motion vector of the upper adjacent blocks on whether the left adjacent blocks include an inter-predicted block, rather than on whether scaling was already performed, was a significant advancement over existing technology.

233. The novel solution of the '469 Patent was not well-understood, routine, or conventional, nor

was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including generating one or more motion vector predictor candidates; selecting a motion vector predictor from among the one or more motion vector predictor candidates; coding a motion vector of a current block using the motion vector predictor; and coding the current block using the motion vector of the current block, wherein the generating includes determining whether left adjacent blocks on a left side of the current block include a first motion vector available without scaling and, if so, generating the first motion vector as a candidate; when the left adjacent blocks do not include the first motion vector, determining whether the left adjacent blocks include a second motion vector made available by scaling and, if so, scaling the second motion vector to generate a scaled second motion vector as a candidate, and if not, not generating a candidate from the left adjacent blocks; determining whether upper adjacent blocks on an upper side of the current block include a third motion vector available without scaling and, if so, generating the third motion vector as a candidate; when the upper adjacent blocks do not include the third motion vector, determining (i) whether the upper adjacent blocks include a fourth motion vector made available by scaling, and (ii) whether the left adjacent blocks include one or more inter-predicted blocks; when (i) the upper adjacent blocks include the fourth motion vector and (ii) the left adjacent blocks do not include an inter-predicted block, scaling the fourth motion vector to generate a scaled fourth motion vector as a candidate; and when (i) the upper adjacent blocks do not include the fourth motion vector or (ii) the left adjacent blocks include at least one inter-predicted block, not generating a candidate from the upper adjacent blocks, was not well-understood, routine, or conventional.

234. The unconventional nature and technological improvements of the ’469 Patent were recognized in the industry. For example, on or around November 8, 2011, a group including many

of the inventors of the ’469 Patent submitted JCTVC-G542, titled “Non-CE9/Non-CE13: Simplification on AMVP/Merge,” to the Joint Collaborative Team on Video Coding (JCT-VC). Ex. 16. Similar to claim 2 of the ’469 Patent, the simplification described in JCTVC-G542 resulted in a technological improvement including by “[r]emoving dependency for a parallel derivation of spatial candidates”:




Ex. 17 (“JCTVC-G542_r1.ppt” submitted on or around November 28, 2011).

235. Certain proposals from this submission were ultimately adopted, based on their technical merits, in implementations of H.265 video coding such as those used by Disney today. See Ex. 18 (JCTVC-G1103_d2 submitted on or around December 30, 2011, incorporating the proposal of JCTVC-G542, stating: “Incorporated amvp position dependency removal (JCTVC-G542)”).

236. Additionally, for example, Texas Instruments confirmed a technological improvement provided by the contribution described by the group including many of the inventors in JCTVC-G542. In a submission on or around November 11, 2011, Texas Instruments stated that the simplification described in JCTVC-G542 “is definitely simpler and can reduce (MUX) complexity for the spatial MVP scaling sharing from upper and left side during the AMVP list derivation

process." Ex. 19 (JCTVC-G891). A reduction in MUX complexity, for example, is a technological improvement.

237. Plaintiff (and any prior owners of the '469 Patent) complied with any applicable marking requirements under 35 U.S.C. § 287 as to the '469 Patent at least because the asserted claims include method claims that do not require marking and/or there is nothing to mark.

**D. U.S. Patent No. 10,992,953**

238. Plaintiff owns by assignment the entire right, title, and interest in and to U.S. Patent No. 10,992,953 (the "'953 Patent"). The '953 Patent, entitled "Moving picture coding method, moving picture coding apparatus, moving picture decoding method, and moving picture decoding apparatus," issued on April 27, 2021, to inventors Toshiyasu Sugio, Takahiro Nishi, Youji Shibahara, Kyoko Tanikawa, Hisao Sasai, Toru Matsunobu, and Kengo Terada. Plaintiff owns all rights to the '953 Patent necessary to bring this action, including the rights to recover for pre-suit infringement to the fullest extent under any provision of law, including 35 U.S.C. §§ 284-287. The '953 Patent issued from U.S. Patent Application No. 17/012,791, filed on September 4, 2020, and claims priority to a chain of applications including Provisional Application No. 61/554,598, filed on November 2, 2011. A true and correct copy of the '953 Patent is attached as Exhibit 4 and incorporated by reference herein.

239. The '953 Patent is not directed to merely an abstract idea or any patent-ineligible concept. Instead, like the '469 Patent, the '953 Patent is directed to novel and unconventional improvements to the generation of motion vector predictor candidates used in inter prediction in the field of digital video coding. The '953 Patent shares a common specification with the '469 Patent, and its claims are directed to similar technological improvements described above in Paragraphs 226-235, which are incorporated by reference here. As with the '469 Patent, the '953 Patent provides improvements over prior motion vector prediction techniques that result in substantial benefits to the processing

speed of video encoding and decoding.

240. As with the ’469 Patent, the ’953 Patent overcame the technical challenges of conventional motion vector predictor generation—namely, the serial dependency that required processing of the upper adjacent blocks to wait for completion of scaling processing on the left adjacent blocks—by employing an unconventional method for generating motion vector predictor candidates from the left adjacent blocks and the upper adjacent blocks. ’953 Patent at claim 2; see also id. at Fig. 13, 15:13-38 (describing the problem of the “Comparative Example,” in which processing on the block group B must “wait for the completion of” processing on the block group A), 9:51-61 (scaling processing “requires great load”). For the left adjacent blocks, when a first block having a first motion vector that is a motion vector available without scaling is included in the left adjacent blocks, the first motion vector is generated as one of the one or more motion vector predictor candidates; when the first block is not included in the left adjacent blocks and a second block having a second motion vector that is a motion vector to be made available by scaling is included in the left adjacent blocks, the second motion vector is scaled, and the scaled second motion vector is generated as one of the one or more motion vector predictor candidates. Id. at claim 2; see also id. at Figs. 9A-9B, 14, 19:63-20:2. For the upper adjacent blocks, when a third block having a third motion vector that is a motion vector available without scaling is included in the upper adjacent blocks, the third motion vector is likewise generated as one of the one or more motion vector predictor candidates. Id. at claim 2; see also id. at 20:3-8. When the third block is not included in the upper adjacent blocks, however, whether a motion vector of the upper adjacent blocks is scaled depends on whether inter prediction is performed on any of the left adjacent blocks, rather than on whether scaling was already performed on the left adjacent blocks. Id. at claim 2; see also id. at 20:9-31. Specifically, the fourth motion vector is scaled, and the scaled fourth motion vector is generated as one of the one or more

motion vector predictor candidates, only when inter prediction is not performed on any of the left adjacent blocks and a fourth block having a fourth motion vector that is a motion vector to be made available by scaling is included in the upper adjacent blocks; when inter prediction is performed on at least one of the left adjacent blocks or the fourth block is not included in the upper adjacent blocks, the one or more motion vector predictor candidates are not generated from the upper adjacent blocks. Id.; see also id. at Fig. 14. As with the '469 Patent, this determination can be made without waiting for the scaling processing on the left adjacent blocks to complete, enabling parallel execution. Id. at 20:29-37; see also id. at 24:7-21 ("In other words, the coding control unit 108 … can determine whether to perform scaling processing on the block group B, without using the result of processing on the block group A."), 24:47-54 ("…in steps S620 and S820, processing on the block group B can be executed without using the result of processing on the block group A, and processing on the block group A and processing on the block group B can be performed in parallel").

241. The '953 Patent therefore provides a specific technological improvement to the functionality and capabilities of video coding technology that results in increased processing speed for coding moving pictures using inter prediction. '953 Patent at 39:45-49 (the disclosed method "can increase the processing speed of coding and decoding moving pictures without increasing the processing load"). By replacing the serial dependency on the left adjacent blocks' scaling result with a determination based on whether inter prediction is performed on any of the left adjacent blocks, the '953 Patent enables parallel generation of motion vector predictor candidates from both the left and upper adjacent blocks, while still limiting how often computationally expensive scaling processing is performed. Id. at 20:29-37 ("increase the processing speed without increasing processing load (without increasing the number of times scaling processing is performed)"), 24:47-54. Conventional technology prior to the '953 Patent was not capable of this processing speed improvement, because

generating motion vector predictor candidates from the upper adjacent blocks required waiting for processing on the left adjacent blocks to complete. Id. at Fig. 13, 15:13-38; see also Paragraphs 226-235.

242. The novel solution of the '953 Patent was not well-understood, routine, or conventional, nor was it simply comprised of well-understood, routine, and conventional activities previously known to the industry. Furthermore, the combination of elements, including generating one or more motion vector predictor candidates; selecting a motion vector predictor from among the one or more motion vector predictor candidates; coding a motion vector of a current block using the motion vector predictor; and coding the current block using the motion vector of the current block, wherein in generating the one or more motion vector predictor candidates, when a first block having a first motion vector that is a motion vector available without scaling is included in left adjacent blocks that are adjacent on a left side of the current block, the first motion vector is generated as one of the one or more motion vector predictor candidates, when the first block is not included in the left adjacent blocks and when a second block having a second motion vector that is a motion vector to be made available by scaling is included in the left adjacent blocks, the second motion vector is scaled, and the scaled second motion vector is generated as one of the one or more motion vector predictor candidates, when the first block is not included in the left adjacent blocks and when the second block is not included in the left adjacent blocks, the one or more motion vector predictor candidates are not generated from the left adjacent blocks, when a third block having a third motion vector that is a motion vector available without scaling is included in upper adjacent blocks that are adjacent on an upper side of the current block, the third motion vector is generated as one of the one or more motion vector predictor candidates, when the third block is not included in the upper adjacent blocks, when inter prediction is not performed on any of the left adjacent blocks, and when a fourth block having

a fourth motion vector that is a motion vector to be made available by scaling is included in the upper adjacent blocks, the fourth motion vector is scaled, and the scaled fourth motion vector is generated as one of the one or more motion vector predictor candidates, and when the third block is not included in the upper adjacent blocks and when inter prediction is performed on at least one of the left adjacent blocks or the fourth block is not included in the upper adjacent blocks, the one or more motion vector predictor candidates are not generated from the upper adjacent blocks, was not well-understood, routine, or conventional.

243. As with the ’469 Patent, the unconventional nature and technological improvements of the ’953 Patent were recognized in the industry, including through the JCTVC-G542 submission by a group including many of the inventors of the ’953 Patent, the adoption of proposals from that submission in implementations of H.265 video coding such as those used by Disney today, and Texas Instruments’ confirmation of the technological improvement provided by that contribution. See Paragraphs 226-235. Similar to claim 2 of the ’469 Patent, claim 2 of the ’953 Patent reflects the simplification described in JCTVC-G542, which resulted in a technological improvement including by “[r]emoving dependency for a parallel derivation of spatial candidates.” Ex. 17 (“JCTVC-G542_r1.ppt” submitted on or around November 28, 2011).

244. Plaintiff (and any prior owners of the ’953 Patent) complied with any applicable marking requirements under 35 U.S.C. § 287 as to the ’953 Patent at least because the asserted claims include method claims that do not require marking and/or there is nothing to mark.

**COUNT I: PATENT INFRINGEMENT OF THE ’001 PATENT**

245. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

246. Disney had knowledge and notice of the ’001 Patent at least by September 16, 2026, and again through the filing of this complaint.

247. Disney infringes the ’001 Patent by, for example, making, using, selling, offering for sale,

and/or importing in the United States apparatuses and/or methods covered by one or more claims of the ’001 Patent and thus directly infringes the ’001 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271. For example, Disney directly infringes the ’001 Patent through its encoding of bitstreams into H.265-compliant (HEVC) formats on servers in the United States.

248. On information and belief, Disney indirectly infringes claims of the ’001 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Disney’s partners and vendors in this District and elsewhere in the United States. For example, on information and belief, as a result of Disney’s inducement, service providers directly infringe the ’001 Patent. Disney has performed and continues to perform these affirmative acts with knowledge of the ’001 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’001 Patent.

249. Upon information and belief, Disney derives revenue, directly and indirectly, from the activities relating to the Accused Instrumentalities and to infringement of the ’001 Patent, including in this District and elsewhere in the United States.

250. Disney’s infringement of the ’001 Patent is willful and deliberate. As detailed above, Disney had knowledge of the ’001 Patent and had knowledge, or was willfully blind, as to its infringement of the ’001 Patent. As discussed above, Disney has had actual knowledge of the ’001 Patent since at least September 16, 2026, when Access Advance notified Disney of the patent. Further, as discussed above, Disney knew or should have known that its actions infringe and actively induce infringement of the ’001 Patent. As discussed above, Disney specifically intended that both itself and/or its service providers infringe the ’001 Patent.

251. Disney’s infringement of the ’001 Patent has damaged and will continue to damage Plaintiff.

252. Exemplary claim 1 of the ’001 Patent recites:

> 1. An encoding method for encoding last position information indicating a position of a last non-zero coefficient in a predetermined order in a current block to be encoded, the encoding method comprising:
>
> binarizing the last position information to generate (i) a binary signal which includes a first signal having a length smaller than or equal to a predetermined maximum length and does not include a second signal or (ii) a binary signal which includes the first signal having the predetermined maximum length and the second signal;
>
> first encoding for arithmetically encoding each of binary symbols included in the first signal using a context switched among a plurality of contexts according to[55] a bit position of the binary symbol; and
>
> second encoding for arithmetically encoding the second signal using a fixed probability when the binary signal includes the second signal,
>
> wherein in the first encoding,
>
> a binary symbol at a last bit position of the first signal is arithmetically encoded using a context exclusive to the last bit position, when the first signal has the predetermined maximum length, and
>
> each of binary symbols at two or more bit positions other than the last bit position of the first signal is arithmetically encoded using a context common to the two or more bit positions.

253. Disney's Accused Instrumentalities perform the method of exemplary Claim 1 of the '001 Patent. An exemplary claim chart is attached as Exhibit 5 and is incorporated by reference herein.

254. Plaintiff is entitled to all rights to recover for present, past, and future infringement for the '001 Patent. Plaintiff is entitled to recover to the full extent allowable under 35 U.S.C. §§ 284-287, including for up to six years prior to the filing of this complaint. There is no marking issue under 35 U.S.C. § 287 or otherwise which would limit damages, and Plaintiff has complied with all relevant statutes for maximum recovery under the law.

**COUNT II: PATENT INFRINGEMENT OF THE '280 PATENT**

255. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

[55] The face of the patent reads "according lo" due to a transcription error by the USPTO from the claims submitted by the applicant, and should have read "according to." This correction, evident from the face of the patent, is not subject to reasonable debate based on the claim language and specification. The prosecution history does not suggest any different interpretation of the claims.

256. Disney had knowledge and notice of the '280 Patent at least by September 16, 2026, and again through the filing of this complaint.

257. Disney infringes the '280 Patent by, for example, making, using, selling, offering for sale, and/or importing in the United States apparatuses and/or methods covered by one or more claims of the '280 Patent and thus directly infringes the '280 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271. For example, Disney directly infringes the '280 Patent through its encoding of bitstreams into H.265-compliant (HEVC) formats on servers in the United States.

258. On information and belief, Disney indirectly infringes claims of the '280 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Disney's partners and vendors in this District and elsewhere in the United States. For example, on information and belief, as a result of Disney's inducement, service providers directly infringe the '280 Patent. Disney has performed and continues to perform these affirmative acts with knowledge of the '280 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '280 Patent.

259. Upon information and belief, Disney derives revenue, directly and indirectly, from the activities relating to the Accused Instrumentalities and to infringement of the '280 Patent, including in this District and elsewhere in the United States.

260. Disney's infringement of the '280 Patent is willful and deliberate. As detailed above, Disney had knowledge of the '280 Patent and had knowledge, or was willfully blind, as to its infringement of the '280 Patent. As discussed above, Disney has had actual knowledge of the '280 Patent since at least September 16, 2026, when Access Advance notified Disney of the patent. Further, as discussed above, Disney knew or should have known that its actions infringe and actively induce infringement of the '280 Patent. As discussed above, Disney specifically intended that both itself

and/or its service providers infringe the ’280 Patent.

261. Disney’s infringement of the ’280 Patent has damaged and will continue to damage Plaintiff.

262. Exemplary claim 1 of the ’280 Patent recites:

> 1. An encoding method for encoding last position information indicating a position of a last non-zero coefficient in a current block to be encoded, the encoding method comprising:
>
> arithmetically encoding each of binary symbols included in a first signal using a context selected from among a plurality of contexts according to a bit position of the binary symbol, the first signal being included in a binary signal of the last position information and having a length smaller than or equal to a predetermined length; and
>
> arithmetically encoding a second signal without using a context, when the binary signal of the last position information includes the second signal,
>
> wherein in the arithmetically encoding each of the binary symbols included in the first signal,
>
> > a binary symbol at a last bit position of the first signal is arithmetically encoded using a context exclusive to the last bit position, when the first signal has the predetermined length, and
> >
> > each of binary symbols at two or more bit positions other than the last bit position of the first signal is arithmetically encoded using a context common to the two or more bit positions.

263. Disney’s Accused Instrumentalities perform the method of exemplary Claim 1 of the ’280 Patent. An exemplary claim chart is attached as Exhibit 6 and is incorporated by reference herein.

264. Plaintiff is entitled to all rights to recover for present, past, and future infringement for the ’280 Patent. Plaintiff is entitled to recover to the full extent allowable under 35 U.S.C. §§ 284-287, including for up to six years prior to the filing of this complaint. There is no marking issue under 35 U.S.C. § 287 or otherwise which would limit damages, and Plaintiff has complied with all relevant statutes for maximum recovery under the law.

**COUNT III: PATENT INFRINGEMENT OF THE ’469 PATENT**

265. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

266. Disney had knowledge and notice of the ’469 Patent at least by October 14, 2026, and again

through the filing of this complaint.

267. Disney infringes the ’469 Patent by, for example, making, using, selling, offering for sale, and/or importing in the United States apparatuses and/or methods covered by one or more claims of the ’469 Patent and thus directly infringes the ’469 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271. For example, Disney directly infringes the ’469 Patent through its encoding of bitstreams into H.265-compliant (HEVC) formats on servers in the United States.

268. On information and belief, Disney indirectly infringes claims of the ’469 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Disney’s partners and vendors in this District and elsewhere in the United States. For example, on information and belief, as a result of Disney’s inducement, service providers directly infringe the ’469 Patent. Disney has performed and continues to perform these affirmative acts with knowledge of the ’469 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’469 Patent.

269. Upon information and belief, Disney derives revenue, directly and indirectly, from the activities relating to the Accused Instrumentalities and to infringement of the ’469 Patent, including in this District and elsewhere in the United States.

270. Disney’s infringement of the ’469 Patent is willful and deliberate. As detailed above, Disney had knowledge of the ’469 Patent and had knowledge, or was willfully blind, as to its infringement of the ’469 Patent. As discussed above, Disney has had actual knowledge of the ’469 Patent since at least October 14, 2026, when Access Advance notified Disney of the patent. Further, as discussed above, Disney knew or should have known that its actions infringe and actively induce infringement of the ’469 Patent. As discussed above, Disney specifically intended that both itself and/or its service providers infringe the ’469 Patent.

271. Disney's infringement of the '469 Patent has damaged and will continue to damage Plaintiff.

272. Exemplary claim 2 of the '469 Patent recites:

> 2. A coding method, comprising:
>
> generating one or more motion vector predictor candidates;
>
> selecting a motion vector predictor from among the one or more motion vector predictor candidates;
>
> coding a motion vector of a current block using the motion vector predictor; and
>
> coding the current block using the motion vector of the current block,
>
> wherein the generating the one or more motion vector predictor candidates includes:
>
> > determining whether left adjacent blocks on a left side of the current block include a first motion vector, the first motion vector being available without scaling;
> >
> > when the left adjacent blocks include the first motion vector, generating the first motion vector as one of the one or more motion vector predictor candidates;
> >
> > when the left adjacent blocks do not include the first motion vector, determining whether the left adjacent blocks include a second motion vector, the second motion vector being made available by scaling;
> >
> > when the left adjacent blocks include the second motion vector, scaling the second motion vector to generate a scaled second motion vector as one of the one or more motion vector predictor candidates;
> >
> > when the left adjacent blocks do not include the second motion vector, not generating the one or more motion vector predictor candidates from the left adjacent blocks;
> >
> > determining whether upper adjacent blocks on an upper side of the current block include a third motion vector, the third motion vector being available without scaling;
> >
> > when the upper adjacent blocks include the third motion vector, generating the third motion vector as one of the one or more motion vector predictor candidates;
> >
> > when the upper adjacent blocks do not include the third motion vector, determining (i) whether the upper adjacent blocks include a fourth motion vector, the fourth motion vector being made available by scaling, and (ii) whether the left adjacent blocks include one or more inter-predicted blocks;

> when (i) the upper adjacent blocks include the fourth motion vector and (ii) the left adjacent blocks do not include an inter-predicted block, scaling the fourth motion vector to generate a scaled fourth motion vector as one of the one or more motion vector predictor candidates; and
>
> when (i) the upper adjacent blocks do not include the fourth motion vector or (ii) the left adjacent blocks include at least one inter-predicted block, not generating the one or more motion vector predictor candidates from the upper adjacent blocks.

273. Disney's Accused Instrumentalities perform the method of exemplary Claim 2 of the '469 Patent. An exemplary claim chart is attached as Exhibit 7 and is incorporated by reference herein.

274. Plaintiff is entitled to all rights to recover for present, past, and future infringement for the '469 Patent. Plaintiff is entitled to recover to the full extent allowable under 35 U.S.C. §§ 284-287, including for up to six years prior to the filing of this complaint. There is no marking issue under 35 U.S.C. § 287 or otherwise which would limit damages, and Plaintiff has complied with all relevant statutes for maximum recovery under the law.

**COUNT IV: PATENT INFRINGEMENT OF THE '953 PATENT**

275. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

276. Disney had knowledge and notice of the '953 Patent at least by October 14, 2026, and again through the filing of this complaint.

277. Disney infringes the '953 Patent by, for example, making, using, selling, offering for sale, and/or importing in the United States apparatuses and/or methods covered by one or more claims of the '953 Patent and thus directly infringes the '953 Patent literally and/or under the Doctrine of Equivalents, in violation of 35 U.S.C. § 271. For example, Disney directly infringes the '953 Patent through its encoding of bitstreams into H.265-compliant (HEVC) formats on servers in the United States.

278. On information and belief, Disney indirectly infringes claims of the '953 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Disney's partners and vendors in

this District and elsewhere in the United States. For example, on information and belief, as a result of Disney's inducement, service providers directly infringe the '953 Patent. Disney has performed and continues to perform these affirmative acts with knowledge of the '953 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '953 Patent.

279. Upon information and belief, Disney derives revenue, directly and indirectly, from the activities relating to the Accused Instrumentalities and to infringement of the '953 Patent, including in this District and elsewhere in the United States.

280. Disney's infringement of the '953 Patent is willful and deliberate. As detailed above, Disney had knowledge of the '953 Patent and had knowledge, or was willfully blind, as to its infringement of the '953 Patent. As discussed above, Disney has had actual knowledge of the '953 Patent since at least October 14, 2026, when Access Advance notified Disney of the patent. Further, as discussed above, Disney knew or should have known that its actions infringe and actively induce infringement of the '953 Patent. As discussed above, Disney specifically intended that both itself and/or its service providers infringe the '953 Patent.

281. Disney's infringement of the '953 Patent has damaged and will continue to damage Plaintiff.

282. Exemplary claim 2 of the '953 Patent recites:

> 2. A coding method, comprising:
>
> generating one or more motion vector predictor candidates;
>
> selecting a motion vector predictor from among the one or more motion vector predictor candidates;
>
> coding a motion vector of a current block using the motion vector predictor; and
>
> coding the current block using the motion vector of the current block,
>
> > wherein in generating the one or more motion vector predictor candidates,
> >
> > when a first block having a first motion vector that is a motion vector available without scaling is included in left adjacent blocks that are adjacent on a left side of the current block, the first motion vector is generated as one of the one or more motion vector predictor candidates,

> when the first block is not included in the left adjacent blocks and when a second block having a second motion vector that is a motion vector to be made available by scaling is included in the left adjacent blocks, the second motion vector is scaled, and the scaled second motion vector is generated as one of the one or more motion vector predictor candidates,
>
> when the first block is not included in the left adjacent blocks and when the second block is not included in the left adjacent blocks, the one or more motion vector predictor candidates are not generated from the left adjacent blocks,
>
> when a third block having a third motion vector that is a motion vector available without scaling is included in upper adjacent blocks that are adjacent on an upper side of the current block, the third motion vector is generated as one of the one or more motion vector predictor candidates,
>
> when the third block is not included in the upper adjacent blocks, when inter prediction is not performed on any of the left adjacent blocks, and when a fourth block having a fourth motion vector that is a motion vector to be made available by scaling is included in the upper adjacent blocks, the fourth motion vector is scaled, and the scaled fourth motion vector is generated as one of the one or more motion vector predictor candidates, and
>
> when the third block is not included in the upper adjacent blocks and when inter prediction is performed on at least one of the left adjacent blocks or the fourth block is not included in the upper adjacent blocks, the one or more motion vector predictor candidates are not generated from the upper adjacent blocks.

283. Disney's Accused Instrumentalities perform the method of exemplary Claim 2 of the '953 Patent. An exemplary claim chart is attached as Exhibit 8 and is incorporated by reference herein.

284. Plaintiff is entitled to all rights to recover for present, past, and future infringement for the '953 Patent. Plaintiff is entitled to recover to the full extent allowable under 35 U.S.C. §§ 284-287, including for up to six years prior to the filing of this complaint. There is no marking issue under 35 U.S.C. § 287 or otherwise which would limit damages, and Plaintiff has complied with all relevant statutes for maximum recovery under the law.

## COUNT V: DECLARATORY JUDGMENT THAT PLAINTIFF HAS COMPLIED WITH APPLICABLE RAND COMMITMENTS

285. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

286. Disney makes and uses products and services that use and comply with the H.265 Recommendation.

287. Plaintiff is prepared to grant licenses to its essential patent claims for implementations of the H.265 Recommendation on a worldwide, non-discriminatory basis and on reasonable terms and conditions, and has at all times been willing to grant such a license to Disney.

288. Plaintiff has negotiated in good faith with Disney, including for example, through negotiations between Disney and Access Advance.

289. Disney has given no indication that it is willing to license Plaintiff's essential patent claims on RAND terms and has not accepted the offer referenced above.

290. On information and belief, Disney contends that claims of the Patents-in-Suit are essential to ITU standards and that Plaintiff's actions, including the offer previously made to Disney, do not satisfy Plaintiff's RAND obligations. Plaintiff, on the other hand, contends that it has complied with any RAND obligations for its essential claims by offering a license under RAND terms. There is a case or controversy of sufficient immediacy, reality, and ripeness to warrant the issuance of a declaratory judgment.

291. Plaintiff seeks a declaration that it has negotiated in good faith toward a license with Disney for any essential patent claims and complied with any obligations it has under the ITU IPR Policy and under any relevant Patent Statement and Licensing declarations.

## ATTORNEYS' FEES

292. Plaintiff is entitled to recover reasonable and necessary attorneys' fees under applicable law.

## DEMAND FOR JURY TRIAL

293. Plaintiff hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor

as follows and afford Plaintiff the following relief:

A. Adjudge and declare that Disney infringes claims of the Patents-in-Suit;

B. Adjudge and declare that Disney's infringement of claims of the Patents-in-Suit was willful, and that Disney's continued infringement is willful;

C. Award Plaintiff its actual damages going back six years from the date of the Original Complaint due to Disney's infringement;

D. Award Plaintiff enhanced damages pursuant to 35 U.S.C. § 284;

E. Award Plaintiff pre-judgment and post-judgment interest to the full extent allowed under the law, as well as its costs;

F. Adjudge and declare that this is an exceptional case and award Plaintiff its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

G. Order an accounting of damages for acts of infringement;

H. Adjudge and declare that, for Plaintiff's patent claims subject to a RAND obligation, Plaintiff has negotiated in good faith and satisfied its RAND obligations; and

I. Award such other relief, including equitable relief, that the Court deems appropriate.

Dated: October 27, 2026

Respectfully submitted,

**FARNAN LLP**

*/s/ Michael J. Farnan*
Brian Farnan (Bar No. 4089)
Michael Farnan (Bar No. 5165)
919 North Market Street
12th Floor
Wilmington, DE 19801
Phone: (302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff*

Of Counsel:

**McKool Smith P.C.**

Kevin Schubert
kschubert@mckoolsmith.com
Emily Tannenbaum
etannenbaum@mckoolsmith.com
McKool Smith P.C.
1301 6th Ave, 32nd Floor
New York, NY 10019

Mitch Verboncoeur
mverboncoeur@mckoolsmith.com
McKool Smith P.C.
303 Colorado Street, Suite 2100
Austin, TX 78701

Chris McNett
cmcnett@mckoolsmith.com
Christian Dorman
cdorman@mckoolsmith.com
McKool Smith P.C.
1717 K Street, NW, Suite 1000
Washington, DC 20006